[No. S018814. June 30, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
RAMON BOJORQUEZ SALCIDO, Defendant and Appellant.

96

■■■■■■■■■■■■■■■■■■

COUNSEL

Conrad Petermann, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Herbert F. Wilkinson and Ronald S. Matthias, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GEORGE, C. J.**—Defendant Ramon Bojorquez Salcido appeals from a judgment of the San Mateo County Superior Court imposing a sentence of death following his conviction of six counts of first degree murder (Pen. Code, § 187, subd. (a)), one count of second degree murder (Pen. Code, §§ 187, subd. (a), 189), and two counts of willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 664, 187, subd. (a), 189). The jury found true a multiple-murder special-circumstance allegation. (Pen. Code, § 190.2, subd. (a)(3).) Defendant admitted the allegations that he personally used a firearm in the commission of counts I (Angela Salcido—murder), IV (Tracey Toovey—murder), and VIII (Kenneth Butti—attempted murder) (Pen. Code, § 12022, former subd. (d)); that he personally used a deadly weapon, a knife, in the commission of counts II (Sofia Salcido—murder), III (Theresa Salcido—murder), V (Marion Louise Richards—murder), VI (Ruth Bernadette Richards—murder), VII (Marie Ann Richards—murder), and IX (Carmina Salcido—attempted murder) (Pen. Code, § 12022.5); and that he personally inflicted great bodily injury in the commission of counts VIII and IX (Pen. Code, § 12022.7). After the jury determined that defendant's punishment should be death, the trial court imposed a sentence of death and also imposed sentence on the noncapital offenses. Defendant's appeal is automatic. (Pen. Code, § 1239, subd. (b).)[1]

We affirm the judgment in its entirety.

---

[1] All further references are to the Penal Code unless otherwise indicated.

## I. FACTS

A. *Guilt Phase Evidence*

 1. *The prosecution's case*

 a. *The crimes*

The evidence established that in the early morning hours of April 14, 1989, defendant drove his three young daughters, Sofia, Carmina, and Theresa to an isolated gulch used as a dumping site, where he cut their throats and left them, resulting in the deaths of Sofia and Theresa. Defendant drove to the residence of his mother-in-law, Marion Louise Richards, where he stabbed to death Marion and her daughters Ruth Bernadette Richards and Marie Ann Richards. Defendant returned home, where he shot to death his wife Angela. He proceeded to his workplace at Grand Cru Vineyard, where he shot to death his supervisor, Tracey Toovey, and then drove to the residence of another supervisor, Kenneth Butti, whom defendant shot and injured. The crimes took place within a period of approximately three hours.

Prior to 1980, while living in his native Mexico, at 18 years of age, defendant married a young woman who had become pregnant by another man. After giving birth, the woman abandoned defendant for the child's father. Following defendant's arrival in the United States that year, defendant moved to Kern County, where he married a second time, to Debra, who bore him a child. When their relationship ended, defendant moved away. The couple did not obtain a divorce. Defendant did not make child support payments.

In the mid-1980's, defendant married his third wife, Angela Richards, who had had a strict Catholic upbringing. They had three daughters, Sofia, Carmina, and Theresa, whom defendant appeared to love very much. Carmina was defendant's favorite.

In early 1987, defendant obtained a job at Grand Cru Vineyard in Sonoma County. Defendant's job responsibilities included operating the "bottling line." Tracey Toovey, the assistant winemaker, was defendant's supervisor. Several months after defendant's employment began, Kenneth Butti was hired. Butti assumed responsibility for running the bottling line and became defendant's primary supervisor. Butti believed defendant was a poor employee, and Toovey informed defendant that he needed to improve his job performance.

At the time of the murders in April 1989, defendant and his family resided in a small one-bedroom rental home that was part of a duplex at 201 Baines

Street in Boyes Hot Springs. Their home was located several blocks from the Sonoma Mission Inn and approximately seven miles from Grand Cru Vineyard. Angela's parents, Robert and Marion Louise Richards, resided together with their two younger daughters in a rented home at 8393 Lakewood Avenue in Cotati.

Defendant was known by acquaintances as a frequent consumer of alcoholic beverages. He enjoyed "fancy" automobiles. Several months prior to the murders, he purchased a Pontiac Trans Am but in January 1989 transferred the vehicle to a friend after it proved difficult for him to make the payments. Defendant also drove a 1981 Buick Skylark. One month prior to the murders, defendant traded the Buick for a Ford LTD.

On Tuesday, April 11, 1989, while he was at work, defendant was served for a second time with documents related to his second wife Debra's efforts to obtain child support, and he informed Butti, his supervisor, of that occurrence. On the following day, Angela Salcido told her neighbor, Connie Breazeale, that defendant previously had been married. Angela laughed about obtaining an annulment of her marriage to defendant.

On the evening of Thursday, April 13, 1989, Breazeale observed defendant load several boxes the size of wine cases into the trunk of his vehicle and drive away. After 9:00 that evening, Mark Ondrasek met defendant at McNeilly's Bar in El Verano, a neighboring community. Defendant sold Ondrasek two cases of sparkling wine that were in his vehicle. Michael Caratti, who recognized defendant from having seen him at several bars, also was at McNeilly's Bar. At approximately 11:30 p.m., Caratti and defendant went to the latter's vehicle, where defendant sold him nine bottles of sparkling wine that were in the trunk. Each of the men had cocaine in his possession and proceeded to snort a "line" (less than one-quarter gram). At defendant's suggestion, they drove to his home, where they ingested additional cocaine with Angela. After 20 minutes, defendant, who did not appear to have difficulty operating the car, drove Caratti back to the bar, where defendant attempted to obtain additional cocaine. The two men ingested the remaining cocaine in their possession. Caratti estimated they consumed a total of approximately one gram of cocaine. Defendant invited Caratti to meet him at the Sonoma Mission Inn to socialize with several women.

Prior to 2:00 a.m. on Friday, April 14, 1989, defendant's friend, Mario Mata, and his wife were asleep in the bedroom of their residence when defendant appeared. Defendant, who smelled of alcohol but did not appear extremely intoxicated, persuaded Mata to attend a party with him. Defendant told Mata that he was leaving the area the next day and that Mata's brother

could move into defendant's house. Defendant asked Mata for $50 to purchase drugs but Mata refused. They drove to McNeilly's Bar, but Mata shortly had defendant drive him home. When defendant returned to the bar at 2:15 a.m., he was rejoined by Caratti and a friend, Larry Mateo, who in a separate vehicle followed defendant to the Sonoma Mission Inn. Caratti noticed that defendant did not appear to have any difficulty driving, but Caratti was "messed up" at the time and was unaware of defendant's state of intoxication.

Upon their arrival at the Sonoma Mission Inn, defendant entered the lobby while Caratti and Mateo waited in their vehicle. At approximately 2:50 a.m., Lela Brooks, the receptionist, conversed with defendant, who spoke very softly and "had trouble" speaking English. Defendant did not smell of alcohol or appear intoxicated or under the influence of drugs. He inquired about a reservation, referring to "Grande." Brooks did not find a reservation listed either for Grand Cru Vineyard or Salcido. A security guard who was out of defendant's sight line had observed two other men waiting outside and signaled to Brooks, "no." Brooks then suggested to defendant that he may have confused the hotel with the Sonoma Valley Inn and telephoned that hotel for him. Defendant spoke for several minutes with someone at the other hotel. As defendant walked outside, he spoke with the security guard, who detected a slight smell of alcohol on defendant but did not have difficulty understanding him. Defendant asked the guard the nightly rate to rent a room and, on hearing it was $200, indicated that was "too much." Defendant drove over to the other vehicle, and after having a short conversation he and the other two men drove off separately.

At 5:39 a.m., Angela withdrew $200 in cash from her and defendant's joint checking account from the automated teller machine at Wells Fargo Bank in downtown Sonoma, a distance of two and one-half miles from the Salcido residence. Angela departed from the bank on foot.

That morning, Angela's parents (Robert and Marion) and her two young sisters (Ruth and Marie) were in their residence on Lakewood Avenue. Robert departed for work prior to 7:00 a.m., and planned to leave directly for New York that evening without first returning home. At approximately the same time, a neighbor, Roy Curtis, saw the Richards family's Chihuahua barking, shaking, and looking at the Richards residence. Curtis never had seen the dog loose before and knocked on the front door, but no one answered. Curtis heard a man's voice, which might have come from a radio or television. At 7:00 a.m., the neighbor who resided directly across the street from the Richardses heard a woman's voice screaming "No, no."

Later the same day, the bodies of Marion and her daughter Marie, who was eight years of age, were discovered lying in the hallway of the Richards home. Marie's nightgown was pulled above her waist, her underpants were wrapped around one ankle, and her legs were spread apart. The body of Ruth, who was 12 years of age, was found lying facedown in the kitchen. Ruth was wearing a nightgown pulled above her waist; her panties, which had blood on them, were wrapped around one foot, and her legs were apart. A bloody handprint was found on Ruth's buttock, and additional handprints were on her thighs. In the hallway, a bloody knife was found near Marion's feet, and two boxes of Federal brand .22-caliber bullets and a box of bandages with blood on it were found nearby. Another box of Federal brand .22-caliber long rifle bullets, which had a fingerprint and blood that proved to be from defendant, was found in the bedroom. Marion's glasses and her pendant were found on the garage floor. The medical examiner determined that Marion had suffered a blunt force injury to the back of her head sufficient to cause unconsciousness. Marion, Marie, and Ruth each died from blood loss due to cut wounds to their throats.

Meanwhile, at 7:14 that morning (as determined from telephone records), a telephone call lasting 30.7 seconds was placed to defendant's home telephone number from the Richards residence. At 7:30 a.m., Mrs. Ledesma, defendant's neighbor in the adjoining unit of the duplex where he and his family resided, was outside her residence. At that time, she did not observe defendant's vehicle. Subsequently, she reentered her own unit. At 8:00 a.m. Ledesma sensed that persons were running inside defendant's unit, and she heard a shot fired. After hearing Angela shout, "Watch out," Ledesma heard a second shot. Angela repeated "Watch out," and Ledesma then heard a third shot.

At approximately 8:00 a.m. defendant's supervisor, Tracey Toovey, left his residence to drive to the winery, a five-minute commute. At 8:20 a.m., Toovey's body was discovered inside his vehicle on the gravel driveway to the vineyard, which was located approximately seven miles from defendant's home. Toovey had suffered four gunshot wounds, three to his head and one to his arm. Two bullets recovered from his head proved to be .22 caliber.

At approximately 8:15 a.m., defendant drove into the driveway of Kenneth Butti's residence, located 2.4 miles from the winery. Butti walked up to defendant's vehicle. Defendant backed his vehicle to within 10 feet of Butti and said, "Hi, how ya doin'." Butti asked defendant, who appeared normal, "What's going on, Ramon?" and noticed defendant had blood on his forearms. Defendant turned away briefly and, when he turned back toward Butti, was holding a gun with his hand resting on the open window ledge of the car door. Butti heard intermittent pops and clicks from the gun, and fell to the

ground when a bullet hit his shoulder. As defendant drove out of Butti's yard, Butti's wife Terri saw from the doorway that the gun was pointed at her and heard a click. Defendant's eyes were open wide; his gaze was steady, and he appeared alert but had no expression.

At 8:26 a.m. (as determined from telephone records), a telephone call lasting one minute and 40 seconds was made from defendant's residence (eight miles from Butti's home) to Los Mochis, Sinaloa, Mexico, where defendant's mother resided. At 8:50 a.m., defendant's neighbor, Connie Breazeale, observed defendant leave hurriedly in his vehicle. At 9:00 a.m., Lieutenant Ballinger and Sergeant Brown of the Sonoma County Sheriff's Department arrived at defendant's residence and discovered Angela's body in the hallway. Six spent bullet casings were found in the kitchen and the hallway. An ATM receipt, an advertisement for childcare, and $200 in cash were found in her clothing. The medical examiner subsequently removed a .22-caliber bullet from her head. She had suffered three bullet wounds, two to her head and one to her shoulder.

At 9:24 a.m. an attempt was made to withdraw $140 from defendant and Angela's joint checking account at a branch of Wells Fargo Bank in San Rafael. At approximately 10:00 a.m., defendant, wearing a light-colored shirt and jacket and white long pants, purchased a shirt and a pair of light-colored pants at a department store in San Rafael. Defendant did not appear to be intoxicated or in a hurry. At 12:18 p.m., defendant cashed checks made out to him by Mark Ondrasek in purchasing the sparkling wine, as well as another check for $200, at the Wells Fargo Bank at the corner of Van Ness Avenue and California Street in San Francisco.

Later that day, the police found defendant's Ford LTD automobile in a parking lot across the street from the department store in San Rafael. In addition to a bag and a credit card receipt bearing defendant's name from the department store, the vehicle contained three notes written in Spanish. The first expressed the hope that "Arturo and Richard" would be arrested because they sold cocaine. The second note stated, "Your father loves you very much. We will see each other in God's other world." The third said, "Forgive me God, but this law made me do it. My children and I could live better but I was pushed into doing it." Under the front passenger seat, the police found a .22-caliber semiautomatic handgun with one round in the chamber, and a knife that had a small amount of blood on it. Near the knife were articles of children's clothing with blood on them and a blanket. Other ammunition and a half-filled bottle of sparkling wine were recovered.

At approximately noon on Saturday, April 15, 1989, defendant's three young daughters were found in the tall grass at the bottom of a 15-foot embankment in a field next to the parking lot at Stagegulch Quarry, which also was used as a dump site, located 6.6 miles from defendant's residence and 13.5 miles from the Richards residence. Two quarry employees observed the bodies of Sofia and Theresa. Near them, Carmina was sitting up, facing her sisters.

Sofia, who was confirmed by postmortem genetic testing not to be defendant's biological daughter, died from loss of blood caused by three large lateral cuts across her throat that penetrated to her spine—any one of which would have been fatal. She may have survived for an undetermined period of time, especially if her going into shock had arrested the flow of blood. She had suffered a wound to her hand consistent with defensive behavior. Theresa died from loss of blood caused by two lateral cuts across her throat that also penetrated to her spine—either of which would have been fatal.

Carmina suffered a large lateral cut across the throat from one side of her jawbone to the other, exposing her voice box and partially detaching her tongue. She apparently remained sitting with her chin supported by her chest for more than 30 hours prior to being found, and because of hunger had consumed some small pebbles during that time. Had she reclined, her tongue could have closed her throat, suffocating her. She had a wound to her hand consistent with defensive behavior. She was extremely dehydrated, in shock, and close to death. She was taken to a hospital emergency room in critical condition and was treated by a team of 20 medical personnel. While being transferred from one bed to another in the hospital, she said, "Daddy cut me."

The knife and the handgun recovered from defendant's automobile were tested. The knife could have inflicted the wounds suffered by defendant's daughters. Ballistics analysis of the bullets recovered from the various victims revealed they were fired from the same Sturm Ruger pistol found in defendant's automobile. A criminalist who tested the weapon discovered that the magazine had a "feeding problem" that caused the first round to "hang up," which could be dealt with by hitting the bolt or by ejecting the first round. Several unfired rounds were discovered at the crime scenes. Mr. Richards confirmed that the handgun was similar to guns he kept in his home as part of a gun collection he stored with ammunition in a bedroom closet.

b. *Defendant's arrest and confession*

Defendant was arrested on April 19, 1989, at a train station outside Los Mochis, Sinaloa, Mexico. Several minutes after boarding a private airplane

for his return to the United States, defendant stated, "I was going to turn myself in. I made a mistake. I'm guilty." During the course of the flight to Sonoma County, defendant made a full statement in English, confessing to shooting and stabbing the victims. Defendant's statement was tape-recorded and later transcribed.[2] Sonoma County Sheriff's Department Detective David Edmonds inquired of defendant as to when he first had considered committing the murders. Defendant believed he first did so on Thursday, April 13, 1989. After being served with child support documents at his workplace, on his return home he and his current wife had argued. Defendant then went to a bar and, during the course of the night, ingested approximately three grams of cocaine and consumed two or three bottles of champagne. When asked whether he had become drunk that night, defendant stated he felt like someone else because he was so out of his mind.

Defendant explained that when he returned home and found that his wife had departed, leaving him with the children, he felt that he wanted to kill her. He ingested cocaine and at approximately 5:00 a.m. drove with his children to look for his wife. After about an hour, because he was angry at his wife, defendant decided to kill himself and his children, and at approximately 6:00 a.m. he drove to the quarry, near the county dump. Defendant took each daughter separately to a spot near his parked vehicle, cut the throat of each from behind, and threw each body into the creek.

Defendant stated that he then drove to his in-laws' residence, 30 minutes away, to look for his wife, and observed Mr. Richards drive away. Defendant intended to kill his mother-in-law who, along with his two sisters-in-law, knew that his eldest daughter was not his biological child. When informed that his wife was not at the Richards residence, defendant asked Marion for a screwdriver, walked with her to the garage, and from behind hit her head once or twice with an automobile jack stand. Defendant went back inside the home, where he encountered Ruth. Defendant obtained a knife, grabbed Ruth from behind, and cut her throat. She was not wearing panties, and he observed her buttocks. By this time Marie appeared, asking where her mother was. Afraid she would ask questions, defendant cut her throat. As defendant continued to the front door, Marion appeared in the hallway. Because defendant was concerned that she might telephone the police, he cut her throat. Having cut his finger, defendant removed Marie's panties to stop the bleeding, and observed her buttocks.

Defendant explained that he next proceeded to the room containing Mr. Richards's firearm collection and took a .22-caliber Ruger automatic pistol. Defendant obtained ammunition from the bedroom and loaded the

---

[2] At trial, a tape recording of defendant's statement was played to the jurors, which they followed on individual copies of a transcription.

weapon, accidentally discharging a bullet into the floor. He departed with the weapon, intending to kill himself and his wife.

Detective Edmonds told defendant he had heard defendant had a reason to kill his wife. Defendant responded that one of the reasons was that she had not told him that he had not fathered their first child. That had upset him slightly, but he had decided it would be all right. When defendant returned to his and his wife's residence, his wife said she would summon the police. Because defendant was frightened, he shot her twice in the head; as she raised her hands, defendant shot her once in the temple, hit her on the head with the gun, and shot her again in the head. Defendant also intended to kill himself.

Defendant related that as he drank champagne in his vehicle, he decided to kill Tracey Toovey and Kenneth Butti. Defendant drove to work to kill Toovey, who generally arrived one hour earlier than Butti. When Toovey drove into the driveway of the winery, defendant flashed his headlights and Toovey pulled alongside. Defendant approached, telling Toovey he was going to kill him. When Toovey inquired whether this was because Toovey intended to fire defendant, defendant replied, "So you got that in mind already." Defendant fired but did not recall how many times. Defendant drove to Butti's residence, where he accused Butti of attempting to take defendant's job and said he intended to kill Butti. Defendant shot at Butti, who began running. Defendant decided to "forget it" and started to drive home. He did not attempt to shoot Butti's wife.

Defendant telephoned his mother in Los Mochis and reported what he had done and that he intended to kill himself. She requested that defendant first visit her and his sister one last time. Defendant drove to San Rafael. At a gas station defendant noticed blood on his pants and removed them. He drove to a store and entered wearing his shorts, purchased new brown pants and a white T-shirt with his credit card, and abandoned his vehicle with the gun and the knife inside. Defendant took a bus to San Francisco, where he cashed checks received in his champagne sales and withdrew cash from his checking account, traveling by bus to Los Mochis, Mexico, a journey that took several days.

c. *Alcohol and cocaine use and effects*

On April 21, 1989, a sample of defendant's blood was taken and analyzed. No cocaine or other drugs were detected. Forensic toxicologist William Phillips testified it was unlikely that cocaine ingested on April 14 would be detectable in defendant's body on April 21, but the presence of cocaine or its metabolite may be detected in dried blood. A sample of dried blood collected from the ammunition box found at the Richards home was established to

have greater than 100 nanograms (one nanogram equals one billionth of one gram) of cocaine and 40 nanograms of cocaine metabolite per gram of whole blood. Although estimation was very difficult, by extrapolation Phillips estimated that the amount of cocaine in defendant's body at the time the blood was deposited was 201 nanograms per milliliter.

Psychiatrist and clinical researcher Dr. Reese Jones, a specialist in psychopharmacology, testified regarding the effects of alcohol and cocaine consumption. Dr. Jones explained that a cocaine user does not necessarily appear or act intoxicated by impairment of motor performance, and in moderate doses cocaine may enhance mental function, whereas alcohol has the opposite effect. Alcohol and cocaine, although operating in opposite manners on the user, tend to elicit his or her innate behavior and traits.

Dr. Jones reviewed the police and toxicology reports, listened to a tape recording of defendant's confession, and was advised of the foregoing test results of the analysis of the dried blood sample. Dr. Jones stated that if high dosages of cocaine repeatedly had been ingested, he would expect to find 500 to 1,000 nanograms of cocaine metabolite per gram of blood.

Dr. Jones also testified that the type of weapon selected by an assailant and the efficiency with which a wound is inflicted tend to indicate the amount of planning involved in an attack. Lying to a victim to induce that person to move to a different spot, such as defendant's lying to Mrs. Richards, and killing the children one at a time, were acts that were consistent with planning rather than with impulsive or disorganized thinking. Defendant's ability to travel from one crime scene to another reflected attention, concentration, and planning inconsistent with the mental impairment that would result from heavy drug usage.

### 2. The defense case

#### a. Defendant's history and socialization

The defense presented testimony regarding defendant's emigration from Mexico and the various circumstances that frustrated his attempts to assimilate in the United States. Alex Saragoza, an associate professor of history in the Department of Ethnic Studies at the University of California, Berkeley, reviewed the police reports and spoke with defendant on several occasions.

Saragoza formed the opinion that defendant exaggerated his own importance, blamed others for his failures, had a poor sense of self, and had low self-esteem. Saragoza found defendant's social history unusual in several respects. Defendant's relationship with his family was strained; he left

Mexico after threatening to kill his entire family, and moved to Northern California without their assistance. Upon returning to his hometown, he boasted of his achievements in the United States. Defendant's experience as a Mexican immigrant was atypical: in Sonoma, defendant had many non-Mexican acquaintances and frequented Anglo-American bars. He portrayed his family in Mexico as more affluent and accomplished than were their actual circumstances.

According to Saragoza, defendant's marital history was out of the ordinary. His first marriage, to a woman pregnant by another man, was not typical in Mexican culture. Defendant married a second time, in the United States, and it was unclear whether his wife Debra's baby was defendant's biological child. Defendant belatedly learned that his third wife, Angela, had borne a child who was not defendant's. Angela was an unusual choice as defendant's marital partner in other respects. She had been educated at home because her family believed the public schools were a bad influence, was taught feminine tasks, and was raised as a strict Catholic. In Saragoza's view, Angela rebelled by, among other things, marrying a Mexican immigrant, to the displeasure of her family. Angela became more independent during the marriage, behavior that was inconsistent with a wife's role in defendant's native culture. At the same time, defendant's behavior toward his family was inconsistent with the male role in his culture. He treated Angela poorly by, among other things, staying out four or five nights a week in bars until 10:00 or 11:00 p.m.

### b. *Defendant's job and home environment*

Defendant's first job in Sonoma County was at St. Francis Winery in Kenwood. According to his employers, defendant was an able employee who required little supervision. Defendant made a concerted effort to learn English and spoke that language better than most Mexican immigrants. Defendant was neat in his grooming, friendly, got along well, and seemed happy. He strove to become Americanized. According to defendant's coworkers and friends, defendant was a likeable person who appeared to love his daughters. He was known as a joker or a clown.

When defendant started working at Grand Cru Vineyard in early 1987, he was friendly, outgoing, and well dressed and punctual. Defendant's use of sick leave was minimal in 1987 but steadily increased. Defendant's fellow employee, David Hellman, who had known him for five years, noted defendant was resentful of Butti, who was prejudiced against Mexican workers. Defendant and Hellman went to bars together (and defendant by himself when Hellman did not accompany him) and drank heavily. In 1987, defendant and Hellman first ingested cocaine, and thereafter used the drug together, in one-quarter to one-half gram amounts, every six to eight weeks. In 1988, defendant began to use cocaine while consuming alcoholic beverages.

Defendant, described by Hellman as a "habitual liar," boasted about being better off than he was in reality. Defendant and Angela obtained a credit card toward the end of 1988, and promptly incurred debt up to the $3,000 maximum. At approximately the same time, defendant purchased a Trans Am automobile that they could not afford. The couple began having difficulty making the payments due on the credit card and the car. By early 1989, defendant relinquished the vehicle to someone else. In the period immediately preceding the murders, defendant's work attendance became more erratic. Hellman warned defendant that if he did not "straighten up," he would be fired.

Several witnesses who had become acquainted with defendant at various bars or restaurants described his drinking habits. Generally these witnesses spoke well of defendant, stating he treated his wife well and had not been violent. Other witnesses confirmed defendant's movements on the day prior to and on the day of the murders, and provided details of defendant's alcohol consumption during that period.

Mr. Richards told a sheriff's deputy that Richards could not understand the killings, because defendant liked Mrs. Richards, who supported her daughter's wish to marry defendant and had done many favors for defendant. The two families had socialized on the Easter Sunday preceding the killings and had had a wonderful time. Several witnesses testified that following the murders, defendant acted as if his family were still alive.

c. *Defense experts*

Pharmacologist and toxicologist Dr. James Meeker analyzed the dried sample of defendant's blood obtained at the Richards residence and determined the blood contained, at most, 36 nanograms of cocaine per milliliter of blood. Dr. Meeker testified that, using this number to extrapolate back to the time defendant's blood had been deposited, there would have been 288 nanograms of cocaine per milliliter of blood, an amount consistent with the analysis performed by Phillips, the prosecution's toxicologist. Dr. Meeker also analyzed the blood sample for the presence of the metabolite benzolecgonine—the cocaine metabolite for which the "vast majority" of laboratories tested, because such analysis produced results more accurate than analysis for metabolites such as methylecgonine. Dr. Meeker detected 6,777 nanograms of benzolecgonine per milliliter of blood. With greater doses of cocaine the ratio of benzolecgonine to methylecgonine increases. In view of the high levels of that metabolite, in Dr. Meeker's opinion a fairly high dosage of cocaine had been ingested.

Dr. David Smith, a specialist in addiction medicine, testified regarding the addictive properties of cocaine, the effects of cocaine consumption in combination with abuse of alcohol, cocaine's propensity to induce paranoid psychosis, and psychopharmacological effects of cocaine on the brain, including its effect on serotonin levels. Dr. Smith explained that high dosages of cocaine deplete the brain's neurotransmitters and, in combination with the subject's inability to sleep, make it more likely that brain function will progress up "the scale of psychosis." Abuse of alcohol tends to impair or deplete the "inhibitory" neurotransmitter serotonin, which is important in balancing the "excitatory" neurotransmitters that may produce negative impulses. Although the combination of alcohol and cocaine may tend to cancel the opposing effects of each substance on the user's motor skills, the combination may increase the negative psychiatric effects. Smith testified that average serotonin levels are 123 nanograms per milliliter of blood. The circumstance that defendant had extremely low serotonin levels in December 1989, but normal levels the following June, indicated that defendant's low serotonin levels most likely were caused by drug abuse rather than genetic predisposition to low serotonin.

Clinical psychologist Dr. Francis Crinella, whose subspecialty was neuropsychology, testified he met with defendant on eight occasions between June 1989 and November 1990, reviewed police reports and news accounts, and learned of defendant's family, criminal, and medical history in Mexico. Defendant did not have any criminal record in that country. Dr. Crinella learned that defendant had had a high fever during infancy, suffered a head injury in a bicycle accident when he was 10 years of age, and received a severe electrical shock during adolescence. Defendant provided Dr. Crinella with varying descriptions of his ailments, indicating an attempt to rationalize his actions and also that he was bright and well organized—characteristics inconsistent with brain damage. Defendant read in the jail's law library when given the opportunity, and in his jail cell kept books concerning famous criminal cases. Defendant told Dr. Crinella that he killed seven individuals but could not recall having done so. According to Dr. Crinella, defendant was motivated to place himself in a good light in the opinion of his listener.

Dr. Crinella reviewed and summarized the results of numerous tests performed upon defendant, including a computerized axial tomography scan, electroencephalogram, magnetic resonance imaging, and neurological and personality testing. The results were generally normal. A neuropsychological test battery that included the Wechsler Adult Intelligence Scale did not reveal the presence of any organic brain dysfunction and established that defendant had an above-average IQ.

Dr. Crinella concluded that defendant had a constant and severe paranoid personality. Events in the months preceding the crimes, including defendant's and Angela's arrest for welfare fraud in July 1988 and their rapid accumulation of credit card debt to the authorized maximum of $3,000 at the end of the year, as well as the cumulative effects of defendant's consumption of alcohol and cocaine, the prospect of losing his job at the same time he was required to assume child support payments, and his wife's increasing independence, in combination adversely influenced defendant's vulnerable mental state. Dr. Crinella also considered the acutely stressful events that immediately preceded the murders, including defendant's being refused a hotel room and his return home to find his children alone. Dr. Crinella concluded that between 6:00 a.m. and 9:00 a.m. on April 14, 1989, defendant had a psychotic episode leading to his commission of the crimes.

### 3. *Rebuttal*

#### a. *Defendant's prior threats*

Federal Bureau of Investigation Agent John Johnson testified that several days after the murders, when defendant was still a fugitive, Johnson interviewed Salvador Oseguera Manzo and Bianey Mata, who were working at St. Francis Winery. The two men informed Johnson that at some point Mata had several heated exchanges with defendant after he overstayed his welcome at Mata's residence and Mata tired of providing defendant with food, beer, and cigarettes. At one point, defendant disclosed to Manzo that he kept several automatic rifles and a pistol in the trunk of his vehicle to "take care of Mata," should the latter cause defendant problems in the future. Manzo and Mata were very concerned for their personal safety.

#### b. *Prosecution experts*

Neuropsychologist Dr. John Walker reviewed defendant's transcribed statement and the police reports of the crimes. Based upon that material, Dr. Walker did not believe that defendant suffered from psychosis at the time of the crimes.

Upon being re-called, Dr. Reese Jones testified that analysis of an individual's serotonin levels present in blood was of limited utility. He explained that, among other limitations, serotonin is but one of 80 to 100 different neurotransmitters that interact with one another in the human body, and that analysis of the level of serotonin present in blood is not as accurate or predictive of brain activity as would be analysis of serotonin in spinal fluid or brain tissue. Dr. Jones testified that the results of the December 14, 1989 blood assay of defendant's serotonin levels reflecting the presence of less

than 10 nanograms of serotonin per milliliter of blood suggested errors in testing, because the body requires some level of serotonin to function. Although low levels of serotonin may indicate a history of mental disturbance or cocaine use, an abnormally low level of serotonin probably would not be attributable to the effects of cocaine last used six months earlier.

Having reviewed the police reports, defendant's statement, and the testimony of Dr. Smith and Dr. Crinella, Dr. Jones also expressed doubt concerning Crinella's opinion that defendant suffered a psychotic episode during the period in which he committed the crimes. Dr. Jones pointed out that during this period, defendant did not display catatonic stupor or excitement, hallucinations or illusions, psychotic delusions, incoherence, or extremely disorganized behavior.

The jury reached its verdict on October 30, 1990, finding defendant guilty of the offenses as charged, with the exceptions that defendant was found guilty of second degree murder of Marie Ann Richards and was acquitted of attempted murder of Mrs. Butti. The jury found true the multiple-murder special-circumstance allegation.

### B. *Penalty Phase Evidence*

#### 1. *The prosecution's case in aggravation*

The prosecution presented a photograph depicting the body of Marie Ann Richards, together with foundational testimony from Detective David Edmonds establishing that the position in which her body was found indicated she had been sexually molested. Marie was found lying on her back with her nightgown pulled above her waist, her knees and lower legs spread wide apart, and her underpants wrapped around one ankle. The body had blood smears near the pelvis.

#### 2. *The defense case in mitigation*

Defendant's mother, Valentina Armendariz, described defendant's youth and family life. Defendant, 29 years of age at the time of trial, was one of seven children. He suffered severe pneumonia at one month of age. Defendant enjoyed school, but when his father died in 1975, it was necessary for defendant to leave school, having received only nine years of education. While growing up, defendant had many friends and got along well with his family. Defendant worked at various jobs and at times contributed to the family's finances.

Defendant's mother testified that defendant had a temper, as had his father. On one occasion, defendant became angry with his sister and destroyed her bed. On another, defendant wanted to use a "locked" telephone at his mother's residence. His mother asked him to use another, unlocked, telephone in the home, but defendant repeated his request and hit his brother in the face when the latter asked defendant to calm down. Defendant's mother and his younger brother did not remember defendant threatening to kill his family. Shortly after that incident, defendant moved to the United States. Later, defendant occasionally telephoned his mother and visited her, accompanied by his wife and children.

Sonoma County Sheriff's Detectives David Edmonds and Larry Doherty traveled to Mexico to investigate defendant's background and interview those who had known him in that country. The detectives ascertained that defendant did not have a criminal record. His childhood neighbors did not report anything negative about defendant, and his former employers provided letters of recommendation.

As noted earlier, before 8:30 a.m. on April 14, 1989, defendant made a telephone call to his mother and informed her that a tragedy had occurred; he had killed his wife, and he was going to be killed or was going to kill himself. Defendant told his mother that he had left his children with a friend. Three days later, defendant appeared at his mother's house, crying and appearing anguished. Defendant asked to see his grandmother and sister before surrendering. Subsequently, defendant sent his mother a letter in which he accepted responsibility for his actions, expressed doubt that his first daughter was his own, and commented that nothing had worked out for him with his first and second wives.

A correctional officer at Sonoma County jail testified that defendant was a good inmate. A former prison warden testified that defendant's record indicated he would not be a danger if he were sentenced to life in prison without the possibility of parole. A postal employee from defendant's community testified that defendant was pleasant, cheerful, very religious, and had nice things to say about everyone. The defense also displayed 10 samples of defendant's drawings.

The penalty phase commenced on November 5, 1990, and the parties concluded the presentation of evidence on November 13. After three days of deliberations, the jury returned a verdict of death on November 16. The trial court declined to modify the verdict and imposed a sentence of death on December 17, 1990.

## II. DISCUSSION

### A. *Asserted Errors Affecting the Guilt Phase of Trial*

#### 1. *Effect on California jurisdiction of defendant's seizure in Mexico*

Defendant contends that because he was a citizen of the Republic of Mexico, he was not subject to seizure in Mexico by law enforcement officials of the United States and California governments. Defendant urges that in obtaining custody of him by falsely representing to Mexican government officials that defendant was a citizen of the United States, American officials violated the terms of the extradition treaty between the United States and Mexico, as well as international law, and as a consequence California forfeited its jurisdiction to prosecute him.[3] According to defendant, the state is required to release him to the custody of law enforcement officials in Mexico, whose legal system does not prescribe a death penalty for any crime, and whose official policy is not to extradite an individual sought for criminal prosecution by another nation having criminal laws that prescribe the death penalty for certain crimes.

##### a. *Factual and procedural background*

On December 12, 1989, defendant moved to prohibit the prosecution from seeking the death penalty on the basis that, in requesting defendant's return to the United States for prosecution, American law enforcement officers intentionally circumvented the extradition procedures of the Extradition Treaty Between the United States of America and the United Mexican States. (Agreement of May 4, 1978, 31 U.S.T. 5059, T.I.A.S. No. 9656, entered into force Jan. 25, 1980 (Extradition Treaty or Treaty).) Defendant asserted that American officials sought to forestall an attempt by the Mexican government to invoke article 8 of the Treaty, which provides that the requested party may refuse extradition unless the requesting party furnishes assurances that its death penalty laws will not be imposed. The prosecution opposed the motion on the basis that only the Mexican government is a party to the Treaty with standing to complain of a violation. Defendant urged in reply that, inasmuch

---

[3] In the proceedings described below, defendant did not challenge the *jurisdiction* of the California court to try him for these offenses. Rather, defendant merely challenged any attempt by the state to assert or impose the death penalty—on the ground that the American officials' seizure of defendant was in violation of the treaty and international law. It is established, however, that a jurisdictional claim raised for the first time on appeal is directed to our court's fundamental authority to act and is not forfeited. (Cf. *People v. Simon* (2001) 25 Cal.4th 1082, 1095–1096 [108 Cal.Rptr.2d 385, 25 P.3d 598]; 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 701, pp. 892–893.)

as the Mexican government participated in defendant's illegal arrest and detention, it could not object to a treaty violation.

The trial court conducted a series of hearings and granted defendant several continuances to pursue further discovery in this matter. Defendant also unsuccessfully applied to obtain commissions to examine foreign witnesses— the subject of defendant's fourth claim below. (See *post*, at pp. 130–132.) On August 1, 1990, defendant moved to preclude application of the death penalty, this time on the theory that the penalty violated international law.[4] Defendant relied upon testimony and other evidence concerning the circumstances of his arrest in Mexico and return to the United States presented at the hearings held in connection with these motions, the substance of which is recounted below.

In seeking custody of defendant, officials in Sonoma County consulted with officials of the offices of the California Attorney General and the United States Attorney regarding matters of formal and informal extradition, and received the assistance of several other government agencies in this country and in Mexico. On April 18, 1989, Sonoma County Sheriff's Detective David Edmonds was apprised that defendant was in Mexico, and Edmonds subsequently learned from a Drug Enforcement Administration (DEA) agent in Mazatlan, Mexico, that defendant had been taken into custody in that city. Los Angeles Police Department (LAPD) Officers Moya and Arturo Zorilla (head of the Latin American Fugitive Unit), whose areas of expertise included international custody, informed Sonoma County officials that the Mexican government might formally extradite, informally expel, or prosecute defendant, and would require certain documents from any American officials who sought custody. Having been apprised that authorities in Mexico likely would not extradite defendant, Sonoma County officials did not seek formal extradition.

Based upon their consultants' advice, Sonoma County officials prepared two information packets. The larger packet was to be provided in the event the Mexican government would not extradite or otherwise release defendant to American law enforcement officers for prosecution in the United States. The packet included a copy of a 1986 Immigration Visa and Alien Registration form designating defendant a Mexican national, and a letter dated April 19, 1989, prepared by Sonoma County District Attorney Gene Tunney, requesting that the Mexican government prosecute defendant as a Mexican national for the murders. The smaller packet contained information concerning the murder case against defendant and identifying him, including his place of birth but not his nationality.

---

[4] Jury selection commenced on July 23, 1990, and concluded on September 5, 1990.

In Mexico, meanwhile, DEA Supervisor Edward Heath, then stationed at the American Embassy in Mexico City, had been apprised that defendant was wanted for murder in the United States and was currently in Mexico. DEA Agent Joseph Martinez, stationed in Mazatlan, provided this information to Heath prior to and following defendant's arrest near Los Mochis by the Mexican Federal Judicial Police, which took place in the presence of Agent Martinez. Defendant was transported to Mazatlan in a convoy of vehicles. DEA Agent Martinez rode in another vehicle. Heath learned from several communications with his agents and with Assistant Attorney General of the Republic of Mexico, Javier Coelho Trejo (second in command at that office), that defendant had identified himself to the federal magistrate in Mazatlan. Although the magistrate was prepared to expel defendant immediately, and Coelho Trejo "did not want someone like that in their country," officials arranged for defendant to be transported (in the company of the federal judicial police and DEA Agent Martinez) to Mexico City to make positive identification.

On April 20, 1989, Sonoma County Sheriff's Detectives Edmonds, Doherty, Mike Brown, and Frank Trejo, and LAPD Officers Moya and Zorilla flew on a borrowed private aircraft to Mexico City. Detectives Edmonds and Doherty and DEA Supervisor Heath met with Coelho Trejo, who told them defendant had signed documents attesting that he was a citizen of the United States. Coelho Trejo also related that he had observed defendant make a statement "to the public" on television that he was a United States citizen and wanted to be returned to the United States. Heath testified that the Americans presented a package to Coelho Trejo that included all of the charges, defendant's fingerprints, his application for an immigrant visa, and other information. Coelho Trejo retained the package, stating he would discuss the matter with his superiors and make a final determination whether to "informally extradite" (or expel) defendant, "or, if it was determined that he was a Mexican citizen possibly he would not be expelled."

Heath testified that in negotiating the terms of defendant's release and transfer, Heath and Coelho Trejo both assumed defendant was an American citizen. Heath believed that was the case, because defendant had resided and worked for several years in the United States, had a Social Security card and a driver's license, and had children and a permanent residence in California. Detective Edmonds told Heath defendant was an American citizen. Heath testified that, had Coelho Trejo realized defendant was a Mexican citizen or national, it would have been difficult for him to surrender defendant to the American authorities.

Approximately three hours after the foregoing meeting, the American agents were informed by the Mexican officials that their government had decided to expel defendant, and that the Americans would be permitted to return defendant to Sonoma County.

During the hearings on defendant's motions to preclude the death penalty because of asserted treaty and international law violations, the trial court considered the testimony of Supervisor Heath, Detectives Edmonds, Trejo, Doherty, Brown, Officer Zorilla, and District Attorney Tunney. Defendant also furnished documents that included the statement of an official in the Mexican Attorney General's office disclaiming knowledge of any written documents executed by defendant in Mexico, and commenting it was highly unlikely such a document existed because defendant had been expelled from that country.

The trial court determined that only a party government may assert a violation of the terms of the Treaty, that the government of Mexico did not seek to invoke the protections of the Treaty or request that defendant not be subject to the death penalty, and that defendant did not appear to have standing to object to any violation of the terms of the Treaty. The court also rejected the claim based on international law, and denied defendant's motions as well as his application for an additional commission and a continuance. Defendant sought relief by filing a petition for a writ of mandate, which was denied by the Court of Appeal.

b. *Analysis*

■ In furtherance of the mutual goal to "cooperate more closely in the fight against crime," under the 1978 Extradition Treaty, the United States and the Republic of Mexico each is required to extradite any person whom the other nation is seeking, has charged, or has convicted of certain offenses within its borders. The Treaty mandates extradition for enumerated willful acts, including murder or manslaughter, that are subject to punishment by the laws of each nation party for a maximum sentence of one or more years. (Art. 2, subd. (1).) The requested party is required to grant extradition if the person "is a national of the requesting Party, and that Party has jurisdiction under its own laws to try that person." (Art. 1, subd. (2)(b).)

Article 8 of the Treaty provides: "When the offense for which extradition is requested is punishable by death under the laws of the requesting Party and the laws of the requested Party do not permit such punishment for that offense, extradition *may* be refused unless the requesting Party furnishes such assurances as the requested Party considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed." (Italics added.)

Article 9, subdivision (1) provides that a nation party is not "bound to deliver up its own nationals," but the executive authority of that party may do so at his or her discretion, if not prohibited by the party's laws. Subdivision (2) provides that if the national is not extradited, the requested party "shall submit the case to its competent authorities for the purpose of prosecution."

In *United States v. Alvarez-Machain* (1992) 504 U.S. 655 [119 L.Ed.2d 441, 112 S.Ct. 2188] (*Alvarez-Machain*), the high court interpreted the Treaty as not defeating federal jurisdiction to prosecute a foreign national abducted abroad for the purpose of prosecution. Following the defendant's indictment for kidnapping and murdering a DEA special agent, the DEA orchestrated the defendant's forcible kidnapping in Mexico to enable his prosecution in the United States. The Mexican government protested. The district court and the circuit court of appeals both ruled that forcible abduction of a Mexican national "with the authorization or participation of the United States" violated the Treaty and, in view of Mexico's formal objection, defeated jurisdiction and required dismissal of the indictment. (504 U.S. at pp. 657–659.)

In reversing the lower courts, the high court compared two early, nearly contemporaneous precedents. In *United States v. Rauscher* (1886) 119 U.S. 407 [30 L.Ed. 425, 7 S.Ct. 234], the court determined the effect of Great Britain's surrender of a British national to the United States for prosecution pursuant to an extradition treaty. The court held that "a person who has been brought within the jurisdiction of the court by virtue of proceedings under an extradition treaty, can only be tried for one of the offences described in that treaty, and for the offence with which he is charged in the proceedings for his extradition . . . ." (*Id.* at p. 430.) In contrast, in *Ker v. Illinois* (1886) 119 U.S. 436 [30 L.Ed. 421, 7 S.Ct. 225] (*Ker*) the court considered the effect on jurisdiction of forcible abduction in Peru of a non-Peruvian national (without objection from Peru) for the purpose of prosecution in the United States. The court held that "forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offence . . . ." (119 U.S. at p. 444; see *Alvarez-Machain, supra,* 504 U.S. at pp. 659–666.)

The high court in *Alvarez-Machain* observed it has " 'never departed from the rule announced in [*Ker*] that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a "forcible abduction" . . . . There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.' " (*Alvarez-Machain, supra,* 504 U.S. at pp. 661–662; see *Frisbie v. Collins* (1952) 342 U.S. 519, 522 [96 L.Ed. 541,

72 S.Ct. 509] [concluding Michigan had jurisdiction to prosecute a defendant abducted in Illinois by Michigan officers, because "due process of law is satisfied when one present in court is convicted of crime after having been fairly appri[s]ed of the charges against him and after a fair trial in accordance with constitutional procedural safeguards"].)

■ In *Alvarez-Machain* the defendant contended the rule in *Ker*, recognizing jurisdiction to prosecute despite abduction from a foreign country, did not apply, because the federal government was involved in his abduction and Mexico objected to his prosecution. In considering whether the defendant's abduction defeated jurisdiction, the high court stated that if the abduction did not violate the terms of the Treaty, the rule in *Ker* applied "and the court need not inquire as to how [the defendant] came before it." (*Alvarez-Machain, supra,* 504 U.S. at p. 662.) The court observed that the Treaty does not discuss "the obligations of the United States and Mexico to refrain from forcible abductions of people from the territory of the other nation, or the consequences under the Treaty if such an abduction occurs." (504 U.S. at p. 663.)

Further considering the language in historical context, the high court held the Treaty does not prohibit abductions when formal extradition is not sought. "Article 9 does not purport to specify the only way in which one country may gain custody of a national of the other country for the purposes of prosecution. In the absence of an extradition treaty, nations are under no obligation to surrender those in their country to foreign authorities for prosecution. [Citations.] Extradition treaties exist so as to impose mutual obligations to surrender individuals in certain defined sets of circumstances, following established procedures. [Citation.] The Treaty thus provides a mechanism which would not otherwise exist, requiring, under certain circumstances, the United States and Mexico to extradite individuals to the other country, and establishing the procedures to be followed when the Treaty is invoked." (*Alvarez-Machain, supra,* 504 U.S. at pp. 664–665.)

The high court next analyzed whether "the Treaty should be interpreted so as to include an implied term prohibiting prosecution where the defendant's presence is obtained by means other than those established by the Treaty." (*Alvarez-Machain, supra,* 504 U.S. at p. 666.) The court found the legislative history did not reflect an intent to prohibit "abductions outside of its terms," and the Treaty does not prohibit abduction "when the nation from which the defendant was abducted objects." (504 U.S. at pp. 666–667.) Thus, jurisdiction was not defeated by the abduction "regardless of the offensiveness of the practice of one nation to the other nation." (*Id.* at p. 667.) The high court also

noted that international law, which clearly prohibits international abductions, does not govern extradition treaties and thus does not affect interpretation of the Treaty. (504 U.S. at p. 668.) "[T]o infer from this Treaty and its terms that it prohibits all means of gaining the presence of an individual outside of its terms goes beyond established precedent and practice" and would require an inferential leap with respect to international law. (*Id.* at pp. 668–669.) Because the defendant's abduction did not violate the Treaty, *Ker* was applicable and the defendant could be tried in this country for violations of its criminal laws. (504 U.S. at p. 670.)

■ In the present case, no proceedings under color of the Treaty were commenced when defendant was apprehended. As federal and state court decisions repeatedly have held, an individual lacks standing to challenge an asserted violation of an international treaty if the sovereign who is a party to the treaty does not protest. (See, e.g., *U.S. v. Emuegbunam* (6th Cir. 2001) 268 F.3d 377, 389–390; *U.S. v. Jimenez-Nava* (5th Cir. 2001) 243 F.3d 192, 195 & fn. 3; *Rodriguez v. State* (Fla.Dist.Ct.App. 2002) 837 So.2d 478, 481; *Commonwealth v. Diaz* (2000) 431 Mass. 822, 827 [730 N.E.2d 845, 850].) Far from protesting defendant's seizure and rendition, Mexico willingly, if not enthusiastically, accommodated defendant's request to return to California in light of the avowal of United States citizenship he made on live television in Mexico. (See *ante*, at p. 122; see also *Case Concerning Avena and Other Mexican Nationals* (Mexico v. United States of America) 2004 I.C.J. 128 (Judg. of Mar. 31, 2004) [Mexico recognized that at the time of his arrest, the defendant asserted his U.S. citizenship].) In the absence of an objection on the part of Mexico, defendant as an individual may not question the validity of his seizure under the Treaty. (*Alvarez-Machain, supra,* 504 U.S. at pp. 668–670; *Ker, supra,* 119 U.S. 436, 444.)

Even if we were to assume for the sake of argument that American law enforcement officers obtained custody of defendant from Mexican authorities by intentionally misrepresenting he was a citizen of the United States and that, had the Mexican authorities believed defendant was a Mexican national, they would have objected to a transfer of custody, as the high court in *Alvarez-Machain* has explained, such involuntary seizures are neither permitted nor prohibited under the terms of the Treaty. Had defendant's "abduction" been accomplished by mendacity rather than by force, that circumstance would not render the rule in *Ker* inapplicable.

■ In the alternative, defendant contends that the conduct of the Republic of Mexico was consistent with his having been expelled, thus rendering the Treaty applicable, because both parties to the Treaty—Mexico and the United States—sought the same result. The circumstance that a foreign national's country of origin informally cooperates with the government of the United

States in securing the removal of the foreign national does not make the removal subject to the terms of the Treaty.

For example, in *U.S. v. Mejia* (D.C. Cir. 2006) 448 F.3d 436, 439, 442–443, the court held that the Panamanian authorities' seizure of the defendants in Panama and rapid transfer of their custody to DEA agents was permissible. Similar to the United States-Mexico treaty, the United States-Panama treaty contained "no prohibition against procuring the presence of an individual outside the terms of the treaty—let alone one barring the signatories from informally cooperating with each other." (448 F.3d at p. 443.) Similarly, in *U.S. v. Bourdet* (D.D.C. 2007) 477 F.Supp.2d 164, 169, 178, DEA and Salvadoran officials met and discussed the manner in which the defendants would be arrested for drug offenses committed in the United States, and Salvadoran officials made the decision to arrest and controlled the ensuing tactical and administrative details. The United States-El Salvador treaty was found not to prohibit or address procurement of an individual outside its terms, and the court, declining to infer a prohibition, held that the defendants' renditions did not violate the treaty or compromise their due process rights. (See also *U.S. v. Suchit* (D.D.C. 2007) 480 F.Supp.2d 39, 49–50.) We see no reason to depart from that precedent in the case before us. Even assuming that defendant has standing to object to a Treaty violation on this theory, his seizure and transportation from Mexico did not violate the Treaty, and the California court had jurisdiction of his case.

 Defendant also suggests that even if federal precedent does not mandate reversal of his conviction on the ground that his custody was obtained through deception committed by the authorities in violation of the Treaty, this court should reverse the judgment in the exercise of our inherent supervisory power "to do equity and administer justice." Defendant urges that doing so would prevent the abuse of court process undertaken by United States officials, who, in deceiving the Mexican government as to defendant's nationality, induced it to violate its obligations under the International Covenant on Civil and Political Rights. It has not been demonstrated that Mexican officials released custody of defendant to American agents as a result of any misrepresentation. Moreover, assuming defendant had standing to invoke that covenant, it is not our task to redress an asserted violation of an international agreement by a nation party. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1298 [57 Cal.Rptr.3d 543, 156 P.3d 1015] (*Prince*); *People v. Cornwell* (2005) 37 Cal.4th 50, 106 [33 Cal.Rptr.3d 1, 117 P.3d 622] (*Cornwell*).)

## 2. *Effect of defendant's seizure on imposition of death penalty*

Defendant contends the trial court erred in denying his motion to preclude imposition of the death penalty following his assertedly illegal seizure in

Mexico. Defendant urges that application of the death penalty would violate his rights under the Fifth and Sixth Amendments to the United States Constitution to due process of law and his Eighth Amendment right to a fair trial as applied to the states by the Fourteenth Amendment.[5]

As explained above, in the trial court defendant moved to preclude the death penalty on grounds similar to those raised on appeal in challenging California's jurisdiction over him—namely, that asserted misrepresentation by United States law enforcement agents to Mexican officials that defendant was a United States citizen violated the Treaty and international law. Similar to the conclusion we reach here, the trial court's holding was that defendant lacked standing to assert such a violation, and that, assuming defendant had standing, his seizure by United States officers did not violate the explicit or implicit terms of the Treaty and did not violate international law. For the same reasons, the present claim must be rejected.

### 3. *Defendant's confession during his return from Mexico*

#### a. *Inadequate* Miranda *warnings*

Defendant contends that the advisements given defendant by Detective Edmonds pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*), during the flight returning defendant to the United States were inadequate.[6] According to defendant, he neither intelligently nor knowingly waived his *Miranda* rights. The transcribed record of

---

[5] Defendant requests that pursuant to Evidence Code section 452, we take judicial notice of "the criminal cases referred to herein," an apparent reference to his petition for writ of mandate filed in this court (*Salcido v. Superior Court* (Sept. 11, 1990, S017395)) challenging the trial court's denial of his request for a commission to examine witnesses in Mexico. The trial court ruled that defendant, as an individual, lacked standing to receive such a commission for this purpose. Following our transfer of the petition to the First District Court of Appeal, that court denied the petition (Sept. 13, 1990, A050953) and we denied review. (Oct. 25, 1990, S017552.) We grant the request to take judicial notice of the relevant documents. We deny defendant's additional requests under Evidence Code section 452 to take judicial notice of "trial court proceedings in other cases," and "proceedings in this court in other cases" consisting of references to the reporter's transcripts of the trials in 51 automatic appeals we previously have decided.

[6] Defendant suggests that his in-flight confession was the fruit of an unlawful interrogation conducted by Mexican officials, and that the "pattern and practice" of that nation's officials make it "reasonable to assume" that such interrogation was coerced and involuntary and that defendant was not advised of his *Miranda* rights. Defendant also theorizes that his confession to Mexican authorities may have been the result of torture or other coercive methods, based upon reports of the general pattern and practice of law enforcement authorities in Mexico as described in a report issued by Amnesty International. (Amnesty International, Amnesty International's Concerns Regarding Torture and Ill-Treatment in Mexico (AMR 41/017/1997, Apr. 30, 1997).) Defendant contends his involuntary confession to authorities in Mexico resulted in his confession to United States law enforcement authorities, rendering the latter confession subject to suppression as tainted by the former. Defendant relies upon a comment

the interview establishes, to the contrary, that Detective Edmonds carefully advised defendant of his *Miranda* rights and inquired in followup questions whether defendant had been beaten or mistreated in any way or felt he was being coerced in any way. Defendant repeatedly responded that he had not been mistreated or coerced and had volunteered to talk with Edmonds about the crimes.

Defendant also claims that his asserted inability to communicate effectively in English contributed to a "perception that the lawyer [provided for him by the government] would be in the Sheriff's employ and not necessarily aligned with defendant's best interests," and evidently the impression that there would be no benefit in requesting or receiving the assistance of an attorney. Defendant relies upon *U.S. v. Garibay* (9th Cir. 1998) 143 F.3d 534, a decision that assertedly bears a "compelling similarity" to his own case. In that matter, the court held the defendant had not knowingly or intelligently waived his *Miranda* rights, because he did not understand the recitation of his rights in English, was not given an opportunity to hear his rights in Spanish, did not have ability in the English language, and had a low verbal IQ. (*Id.* at pp. 537–538.)

In the present case, by contrast, the transcript of advisements, followup questions, and defendant's responses establishes that Detective Edmonds inquired whether defendant wished to receive the advisements in English or in Spanish and whether he was more comfortable conversing in English or in Spanish. Spanish-speaking agents were present on the flight, with whom defendant could consult if there was something he did not understand. In

---

by Detective Edmonds to defendant, in their transcribed interview on the flight returning to the United States, that Edmonds "heard" defendant had a reason for killing his wife, and asked whether that was true.

As defendant acknowledges, the record in general, and Detective Edmonds's comment in particular, do not reflect that defendant was interrogated in Mexico. According to the testimony offered at hearings related to defendant's above described pretrial motions (notably, that of DEA Supervisor Heath relating his meeting with Mexico's Assistant Attorney General Coelho Trejo (see *ante,* at p. 121)), defendant appeared on television in Mexico, claiming to be a United States citizen and requesting that he be returned to this country, and did not exhibit any signs of mistreatment. Moreover, upon defendant's arrest and conveyance to Mazatlan, Mexican officials promptly transported him to Mexico City, where officials determined that defendant should be expelled and promptly transferred him to the custody of United States officials.

In asserting that a coerced interrogation did occur or was likely to have occurred based upon generalized studies of law enforcement practices in Mexico, defendant contends, as discussed more fully below (*post,* at pp. 130–132), that the trial court erred in denying his motions for a commission to examine officials who were present at defendant's arrest in Mexico or who were familiar with that nation's interview practices. The trial court's denial of defendant's request for a commission to interview foreign resident witnesses is discussed in part II.A.4., *post.* Here we consider the claims related to the *Miranda* warnings and the interview conducted by American officials during the return flight to the United States.

addition, as explained in expert testimony, defendant had an above-average IQ. Unlike the defendant in *Garibay*, defendant was provided an ample opportunity to be advised in Spanish and to communicate in that language, and had the innate intelligence to decide whether to avail himself of that opportunity.

■ Finally, defendant contends his waiver of *Miranda* rights was invalid because, in obtaining the waiver, Detective Edmonds failed to advise defendant that he might face the death penalty if found guilty. In rejecting such a claim in *People v. Hill* (1992) 3 Cal.4th 959 [13 Cal.Rptr.2d 475, 839 P.2d 984], we explained that *Miranda* does not require the authorities to apprise a suspect of the crimes with which he or she may be charged. We explained that "[i]f a suspect need not be informed of the possible charges against him, there is no basis for concluding that he must be advised of the possible punishment for those charges if proven." (*Id.* at p. 982.)

b. *Involuntariness*

Defendant contends that both his *Miranda* waiver and his ensuing statement are attributable "to his will being overborne" and thus are involuntary. As mentioned earlier, defendant believes we should infer involuntariness from the likelihood that defendant was physically and psychologically coerced while in the custody of Mexican law enforcement officers and, in addition, "[a]fter this ordeal, he was physically, mentally and emotionally exhausted." Defendant also points to the circumstances surrounding his seizure by American officials, his recent ingestion of drugs and alcohol, the circumstances of the flight, including lengthy confinement in a small aircraft, lack of sleep, water, and access to a telephone, his inability to communicate effectively in English, and Detective Edmonds's assertedly coercive questioning tactics.

As an initial matter, defendant requests that the court overlook defense counsel's failure to object to the admission of the confession at trial or, alternatively, determine that defense counsel violated defendant's Sixth Amendment rights by providing ineffective assistance. We shall discuss the latter claim with the other claims of ineffective assistance of trial counsel.

On the merits, we conclude that the circumstances of defendant's arrest and transfer did not contribute to or result in his will being overborne. Defendant's spontaneous initial admission of guilt (in itself consistent with the self-incriminating notes found in his vehicle), the absence of physical signs or other evidence that defendant had been mistreated prior to or during his transfer to American officials, together with the recording of the *Miranda* advisements, defendant's explicit waiver of his rights, and his subsequent

lengthy and detailed narrative of the circumstances of the crimes, are simply inconsistent with involuntary conduct on his part. The record evidence amply reflects defendant's personal willingness, if not desire, to discuss his crimes.

4. *Trial court's denial of a commission to examine Mexican officials concerning defendant's confession*

Defendant contends the trial court erred in denying his applications for a commission to examine witnesses in Mexico who assertedly were material with respect to the circumstances both of defendant's release and transfer to American law enforcement officials, and of defendant's interrogation. Defendant asserts the interrogation may have been a "joint venture" between Mexican and American officials, requiring that adequate *Miranda* warnings and other American legal protections be provided. Defendant claims the trial court's error violated his rights to due process of law and a fair trial under the Fifth, Eighth, and Fourteenth Amendments.

At the time defendant initially moved in December 1989 to bar the prosecution from seeking the death penalty based upon asserted treaty violations (see *ante*, at pp. 119–122), defendant filed a related motion for discovery regarding his apprehension in Mexico and transfer to the custody of American law enforcement officials. The trial court denied the discovery motion on the ground that as an individual, defendant lacked standing to assert a violation of the Treaty or rely upon it as a third party beneficiary. The court granted several continuances to pursue further discovery.

On May 30, 1990, defendant applied for the issuance of a commission to examine 13 nonresident witnesses, including Assistant Attorney General Coelho Trejo, Department of Foreign Relations Director of Legal Affairs Dr. Alberto Szekley, and Mazatlan Police Comandante Antonio Romero, all officials of the Republic of Mexico, as well as DEA Agents "Joe Heath" (actually, Edward Heath), James Reagan, Joseph Martinez, Ricky Sanchez, and Eddy Sanchez, and five members of defendant's family. Defendant urged these witnesses were necessary to provide evidence concerning asserted due process violations resulting from official circumvention of the Treaty. The trial court denied the request on the basis that the court lacked jurisdiction to compel testimony in a foreign nation, noting as it had earlier that a commission was not available as a discovery tool. The court denied a motion for an additional continuance.

At the hearing held August 13, 1990, in connection with defendant's renewed motion to prohibit the prosecution from seeking the death penalty on the basis of due process violations occurring during defendant's transfer to American officials, DEA Supervisor Heath testified as described above regarding the circumstances of defendant's arrest, transportation to Mexico

City, and ultimate release to United States officials. Defendant filed a renewed application for a commission on August 20, 1990, based on that testimony, naming only Coelho Trejo and Dr. Szekley. The trial court denied the motion on the grounds that a commission was an inappropriate means of discovery, and that it had not been demonstrated these prospective witnesses could provide testimony that would be material at trial, or material, admissible, or relevant in the proceedings on the defense motion to bar the death penalty.

■ Sections 1349 through 1362 set forth procedures under which a defendant may have a material witness residing outside the state or the country examined on an issue of fact arising in a pending criminal action. The defendant must apply for an order to examine the witness upon a commission (§§ 1349, 1350), based upon an affidavit stating the testimony of the witness is material to defense of the action. (§ 1352; see *People v. Cavanaugh* (1968) 69 Cal.2d 262, 266 [70 Cal.Rptr. 438, 444 P.2d 110] [holding a witness may not be deemed material on the basis that he or she possibly could provide pertinent testimony in trial; the defense must demonstrate materiality at the hearing].) If the court "is satisfied of the truth of the facts stated, and that the examination of the witness is necessary to the attainment of justice," it must order issuance of a commission to take the witness's testimony. (§ 1354; *People v. Stewart* (1924) 68 Cal.App. 621, 624 [230 P. 221].)

The commission itself is a process issued under seal of the court, authorizing a designated individual to take the deposition of the named foreign witness and return it to the court. (§ 1351; *Volkswagenwerk Aktiengesellschaft v. Superior Court* (1973) 33 Cal.App.3d 503, 506–507 [109 Cal.Rptr. 219].) Depositions taken under the commission may be read into evidence by either party at trial on a finding the witness is unavailable under Evidence Code section 240. (§ 1362.) The procedure does not afford any means by which such testimony may be compelled; obtaining the testimony is subject to the consent of the person whose testimony is sought.

The trial court's ruling on the application is reviewed for an abuse of discretion. (*People v. Oakley* (1967) 251 Cal.App.2d 520, 525 [59 Cal.Rptr. 478] [trial court did not abuse its discretion in denying defense motion for two-week continuance of trial to permit taking depositions of certain witnesses when record was silent as to substance of intended testimony]; *People v. Markos* (1956) 146 Cal.App.2d 82, 85 [303 P.2d 363] [trial court did not abuse its discretion in refusing an additional postponement when the defendant had the benefit of several continuances and several months to obtain the deposition of witness]; *People v. Stewart, supra,* 68 Cal.App. 621, 624 [trial court did not abuse its discretion in denying order for commission

when affidavit accompanying application merely stated the person's testimony was material without describing the proposed testimony or any showing of its materiality].)

In the present case, defendant was permitted a number of continuances in order to investigate the circumstances of his surrender, arrest, and treatment during the time he was in the custody of law enforcement officials in Mexico. Defense counsel made several trips to that country as part of the defense investigation and, in reporting to the trial court on his progress, complained he was being "stonewalled" by officials there. When the trial court denied the renewed motion on the ground, among others, that the court was not authorized to compel the testimony of the foreign witnesses, it was aware those witnesses had not willingly provided information to defense counsel. In addition, by that time, several other witnesses had provided details of defendant's release to the custody of United States officials. As the court observed, Dr. Szekley could not have testified concerning what the Mexican officials would have done had it been clearly established that defendant was a Mexican national. The trial court properly determined under section 1354 that "the examination of the additional witnesses [was not] necessary to the attainment of justice." Its ruling did not violate defendant's constitutional rights.

### 5. *Prosecution's for-cause challenges of prospective jurors*

Defendant contends that in the course of voir dire conducted to determine the views of prospective jurors concerning the death penalty, the trial court improperly granted the prosecutor's challenges for cause of two prospective jurors, T.C. and F.P. Defendant asserts the excusals were not justified by any showing that the views of these prospective jurors would prevent or substantially impair the performance of their duties as jurors. He asserts that excusal based merely upon a juror's absence of enthusiasm for the onerous task of serving as a juror in a capital case violated defendant's rights to due process of law and a fair and impartial jury under the federal and state Constitutions (U.S. Const., 5th, 6th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16 & 17).

█ As we repeatedly have observed, "[i]n a capital case, a juror is properly excused for cause if that juror would 'automatically' vote for a certain penalty or if the juror's views on capital punishment would ' " 'prevent or substantially impair' " ' the performance of his or her duties in keeping with the juror's oath and the court's instructions. (*People v. Stitely* (2005) 35 Cal.4th 514, 538 [26 Cal.Rptr.3d 1, 108 P.3d 182], quoting *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 88 S.Ct. 1770], and *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].)" (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1313 [63

Cal.Rptr.3d 433, 163 P.3d 118] (*Alfaro*).) Recently the high court reviewed the underlying relevant principles: "First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. [*Witherspoon, supra,* 391 U.S. at p. 521.] Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. [*Witt, supra,* 469 U.S. at p. 416.] Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. [*Id.* at p. 424.]" (*Uttecht v. Brown* (2007) 551 U.S. 1, 9 [167 L.Ed.2d 1014, 127 S.Ct. 2218, 2224] (*Uttecht*).)

The high court continued: "Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts. [*Witt, supra,* 469 U.S. at pp. 424–434.] [¶] Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors. [Citations.]" (*Uttecht, supra,* 551 U.S. 1, 9 [127 S.Ct. 2218, 2224].) The latter comment confirms our established rule that such a determination involves an assessment of a prospective juror's demeanor and credibility that is " 'peculiarly within a trial judge's province.' [Citation.] 'When applying these rules, the trial court's assessment of a prospective juror's state of mind will generally be binding on the reviewing court if the juror's responses are equivocal or conflicting . . .' [citation] [and] the reviewing court generally must defer to the judge who sees and hears the prospective juror, and who has the 'definite impression' " the juror is biased even when the juror's views are not clearly stated. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1006–1007 [47 Cal.Rptr.3d 467, 140 P.3d 775] (*Lewis and Oliver*); see *People v. Chatman* (2006) 38 Cal.4th 344, 365–366 [42 Cal.Rptr.3d 621, 133 P.3d 534]; *People v. Schmeck* (2005) 37 Cal.4th 240, 257, 263 [33 Cal.Rptr.3d 397, 118 P.3d 451] (*Schmeck*).)

We apply those precepts to the present case. When questioned by the trial court, Prospective Juror T.C. confirmed her response on the juror questionnaire that, in her view, a juror who voted for the death penalty essentially committed murder, and that she was strongly opposed to the death penalty and would be unable to impose that punishment. At this point, the trial court indicated it would excuse T.C. for cause. Defense counsel asked T.C. whether she automatically would vote for life imprisonment without the possibility of

parole. T.C. responded she would have to hear both sides and had not really decided. She also stated she would be able to follow the law as given to the jury by the trial court and rationally decide whether death or life in prison without parole was the appropriate punishment, taking into account all of the circumstances.

The trial court reminded T.C. of her earlier comments that she would not be able to impose the death penalty. T.C. responded that she was not "for" that penalty, but if the law prescribed it she would have to vote for it. The trial court explained that first degree murder with a special circumstance finding such as multiple murder may "carry" the death penalty, and if the jury found multiple murders it would be asked to decide whether the death penalty *should* apply. Asked whether she would be unable to make a decision to impose death, T.C. responded that she might not be able to impose the death penalty. Asked whether it seemed too much in light of her moral standards to be asked to impose that punishment, T.C. responded "Yes." Over defense counsel's objection, T.C. was excused for cause.

Defendant asserts that T.C. never was asked whether her views concerning the death penalty would prevent or substantially impair her from performing her duties as a juror. He urges that she was questioned by the trial court in a manner that would elicit her views in opposition to the death penalty, she "rose to the bait" in answering that she did not believe she could impose the death penalty, and her answers revealed reluctance rather than inability to impose the death penalty. Considered together with her initial unequivocal answers indicating she would be unable to impose the death penalty, however, her subsequent equivocal responses, followed by the firm statement that her moral beliefs would not permit her to impose that punishment, convey an inability to vote in favor of death notwithstanding the evidence. At best, her temporary equivocation in responding requires that we defer to the trial court's assessment of her initial and ultimate state of mind. The court acted within its discretion in excusing T.C. based upon its "definite impression" the prospective juror held views that would substantially impair her ability to perform the duties of a juror in this case. (*Lewis and Oliver, supra,* 39 Cal.4th at p. 1008.)

Prospective Juror F.P. indicated on his juror questionnaire that the death penalty was not fair to the poor, but as long as it existed in law, it should be used in some cases. Asked by defense counsel whether he was leaning for or against the death penalty, F.P. said he was "not leaning towards anything right now." Asked by defense counsel whether he could vote for life if 11 other jurors voted for death, F.P. said "always" and said he definitely would listen to his own feelings and would have no trouble reaching his own decision. Asked by the prosecutor whether, if given a choice, F.P. would "do away

with" the death penalty, F.P. responded he did not know, had discussed it with friends, and believed it was appropriate for a defendant such as Ted Bundy. F.P. indicated he had mixed feelings about the death penalty, but also stated he believed he was capable of imposing it and could follow the law given by the court.

When general voir dire resumed two weeks later, however, F.P. indicated he had given a lot of thought to whether he would be able to apply the death penalty, and that after he departed from the courtroom, the weight of assuming the burden of making a determination of death in the case first "hit" him. F.P. indicated that even if he were to determine that death was the proper punishment, he would have difficulty voting in favor of the death penalty. The trial court excused him for cause, and defense counsel did not object.

Defendant contends that Prospective Juror F.P. did not give equivocal answers but rather stated he could follow the law and did nothing to suggest that his ability to perform his duties as a juror would be impaired, let alone substantially impaired, by his views concerning the death penalty. In light of the record of the voir dire of F.P., it is clear that the court acted well within its discretion in excusing him based upon his initial somewhat equivocal answers, followed by much more definite indications that he would be unable to vote in favor of the death penalty regardless of the evidence. To the extent the prospective juror's views were conflicting, we must defer to the assessment of the trial court that F.P. entertained views substantially impairing his ability to perform the duties of a juror. (*Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1008.)

### 6. *Prosecution's peremptory challenges of "minority group" prospective jurors*

■ The prosecution excused eight "minority group" prospective jurors in total, including all of the Hispanics. Defendant contends that by denying his motion challenging the prosecution's excusal of six of these prospective jurors, the trial court violated defendant's rights to trial by a fair and impartial jury and to equal protection of the laws under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution (*Batson v. Kentucky* (1986) 476 U.S. 79, 88 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*)), as well as his right to a jury drawn from a representative cross-section of the community under article 1, section 16 of the state Constitution (*People v. Wheeler* (1978) 22 Cal.3d 258, 278–282 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*); see *Lewis and Oliver*, *supra*, 39 Cal.4th at pp. 1007–1008).[7] A prosecutor is

---

[7] At trial defendant relied solely upon *Wheeler* and did not invoke *Batson*. We have recognized that an objection on the basis of *Wheeler* also preserves claims that may be made

precluded by these constitutional principles from utilizing peremptory challenges to challenge prospective jurors based upon bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds." (*Wheeler, supra,* 22 Cal.3d at pp. 276–277; see *Batson, supra,* 476 U.S. at p. 88; *Cornwell, supra,* 37 Cal.4th at p. 66; *People v. Griffin* (2004) 33 Cal.4th 536, 553 [15 Cal.Rptr.3d 743, 93 P.3d 344]; *People v. Cleveland* (2004) 32 Cal.4th 704, 732 [11 Cal.Rptr.3d 236, 86 P.3d 302].)

■ Subject to rebuttal, a presumption exists that a peremptory challenge is properly exercised, and the burden is upon the opposing party to demonstrate impermissible discrimination against a cognizable group. (*Purkett v. Elem* (1995) 514 U.S. 765, 768 [131 L.Ed.2d 834, 115 S.Ct. 1769]; *People v. Bonilla* (2007) 41 Cal.4th 313, 341 [60 Cal.Rptr.3d 209, 160 P.3d 84] (*Bonilla*).) As the United States Supreme Court recently reaffirmed, *Batson* sets forth the procedure and standard that trial courts should employ in ruling upon motions challenging peremptory strikes. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1104 [63 Cal.Rptr.3d 297, 163 P.3d 4] (*Zambrano*); *Lewis and Oliver, supra,* 39 Cal.4th at pp. 1008–1009.)

"First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted (*Johnson*); see *Snyder v. Louisiana* (2008) 552 U.S. 472, ___ [170 L.Ed.2d 175, 128 S.Ct. 1203, 1207] (*Snyder*); *Zambrano, supra,* 41 Cal.4th at p. 1104; *Bonilla, supra,* 41 Cal.4th at p. 341; *Lewis and Oliver, supra,* 39 Cal.4th at pp. 1008–1009; *People v. Johnson* (2006) 38 Cal.4th 1096, 1099 [45 Cal.Rptr.3d 1, 136 P.3d 804].) The identical three-step procedure applies to claims made under the state Constitution. (*Bonilla, supra,* at p. 341; *People v. Bell* (2007) 40 Cal.4th 582, 596 [54 Cal.Rptr.3d 453, 151 P.3d 292].)

Ordinarily, we apply a deferential standard of review to the trial court's denial of a defendant's *Wheeler/Batson* motion, considering only whether the ruling is supported by substantial evidence. (*Bonilla, supra,* 41 Cal.4th at p. 341; *Lewis and Oliver, supra,* 39 Cal.4th at p. 1009; see *People v. McDermott* (2002) 28 Cal.4th 946, 971 [123 Cal.Rptr.2d 654, 51 P.3d 874] (*McDermott*).) A prosecutor is presumed to employ peremptory challenges in

under *Batson.* (*Lewis and Oliver, supra,* 39 Cal.4th at pp. 1007–1008; *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

a constitutional manner, and we defer to the trial court's ability to assess the prosecutor's rationale for excusal in order to distinguish " ' "bona fide reasons from sham excuses." ' " (*Zambrano, supra,* 41 Cal.4th at p. 1104; see *Lewis and Oliver, supra,* at p. 1009; *People v. Burgener* (2003) 29 Cal.4th 833, 864 [129 Cal.Rptr.2d 747, 62 P.3d 1].) We also defer to the trial court's conclusions in ruling on the motion, so long as the court makes "a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered." (29 Cal.4th at p. 864; see *Lewis and Oliver, supra,* at pp. 1008–1009.)

After the high court concluded in *Johnson* that the state constitutional standard employed in *Wheeler* to determine whether a defendant has made a prima facie case of group discrimination was more rigorous than, and therefore violated, the federal constitutional standard enunciated in *Batson* (*Johnson, supra,* 545 U.S. 162, 168; *People v. Ward* (2005) 36 Cal.4th 186, 201, fn. 2 [30 Cal.Rptr.3d 464, 114 P.3d 717] (*Ward*)), we recognized that a different standard of appellate review is required in cases predating *Johnson* in which the trial court determined the defendant failed to make a prima facie case of group discrimination. Thus, when it is unclear exactly what standard the trial court has employed in deciding whether the defendant has made a prima facie case, we may not accord deference to the trial court's finding that no prima facie case has been made, but must be satisfied from our independent review of the record that the defendant has made an insufficient showing at the outset to permit an inference of discrimination. (*Zambrano, supra,* 41 Cal.4th at p. 1104; *Bonilla, supra,* 41 Cal.4th at p. 341.)

In the alternative, we may assume, without deciding, that defendant in the present case succeeded at the first, "prima facie" step of *Batson* and *Wheeler* by pointing out that the prosecutor employed one-half of his first 16 peremptory challenges to excuse prospective minority-group jurors, including all four of the Hispanic persons called to the jury box and four African-American or Filipino individuals. (See *Zambrano, supra,* 41 Cal.4th at p. 1106.) "Because the prosecutor voluntarily explained his dismissals, we may then proceed directly to the second and third steps of the *Wheeler/Batson* analysis. [Citations.]" (*Zambrano, supra,* at p. 1106; see *Bonilla, supra,* 41 Cal.4th at p. 343, fn. 13 [the "better practice" is for the trial court to request that the prosecution offer its race-neutral explanation for any contested peremptory challenge, despite the possibility the court will not find a prima facie case, in order to assist trial and appellate courts in evaluating the challenge].)

We adopt the alternative approach in the present case. During jury selection, after the prosecutor exercised 14 peremptory challenges, defense counsel objected to the excusal of Prospective Jurors R.H., J.N., and R.N. (whom defense counsel identified as Hispanic), G.P. (whom counsel identified as

Filipino), and J.F. and "especially" E.O. (whom counsel identified as African-American). Defense counsel asserted the prosecutor was engaged in a "systematic use of peremptory challenges to exclude a cognizable group under the *Wheeler* decision." The trial court held a hearing in chambers and questioned the prosecutor, who observed "[w]e have left minorities on" and offered to provide a reason for each person challenged, having "nothing to do with their race or ethnic group." The court indicated it did not appear defendant had made a prima facie case, and directed that the proceedings continue. In open court, the parties accepted the panel as then constituted.

During the ensuing selection of the alternate jurors, the prosecutor employed peremptory challenges to excuse Prospective Alternate Jurors M.M. and R.F. Defense counsel renewed his objection pursuant to *Wheeler*, identifying M.M. and R.F. as, respectively, Hispanic and African-American. The court reconvened the hearing in chambers. The prosecutor, observing that one seated juror, A.A., was African-American, explained that Prospective Alternate Juror M.M. stated she could not envision a situation in which she could possibly vote for the death penalty if given the alternative of life imprisonment without parole, and R.F. had essentially the same attitude as M.M. The trial court expressed uncertainty with respect to the precise nature of the prima facie standard but denied the motion, while advising that it would consider the matter further. The court requested that the prosecutor state his reasons for the challenges, following selection of the alternate jurors.

After the alternate jurors had been chosen, the trial court resumed the hearing in chambers and made the following comment for the record. The court was uncertain of the exact percentage of total minority-group prospective jurors excused by the prosecutor, but believed he had not done anything reflecting purposeful discrimination against any minority. In exercising the peremptory challenges, the prosecutor "was reviewing" each prospective juror's questionnaire and did not appear affected in any way by the particular juror's race or nationality during the individual questioning. No pattern of discrimination appeared to the trial court to be present.

The prosecutor, having previously provided reasons for excusing Prospective Alternate Jurors M.M. and R.F., proceeded to state his reasons for excusing the other prospective jurors identified by defendant. The prosecutor believed that Prospective Juror G.P. was too anxious and immature to sit on the jury. G.P. did not appreciate the gravity of the situation, exhibited a willingness to excuse or justify "any behavior," and in comments on her questionnaire noted there "was a reason behind" defendant's actions, whether or not they were justified.

The prosecutor questioned the stability of Prospective Juror J.N. In view of the circumstances of the case, the prosecutor found it significant that during a period in his life when J.N. consumed alcoholic beverages, he evidently had been violent and abusive toward his family, raising a doubt whether he would examine the evidence in a detached manner. J.N. appeared to conceal his actual views concerning the death penalty by offering a "stock" response to each of the prosecutor's questions—namely, that this was a sensitive case, and he would decide "when the time comes."

The prosecutor noted that Prospective Juror R.H. was merely 19 years of age. During the time jury selection was in progress, R.H. had visited her boyfriend in jail and had observed defendant. R.H. appeared to have a negative view of the death penalty because her mother had told her that "only God can take a life."

The prosecutor felt that Prospective Juror R.N. opposed the death penalty and that this juror believed that no human had the right to take another person's life. R.N. had stated on the juror questionnaire that he had heard defendant killed his wife because he believed she was unfaithful to him, he had been on drugs, and he was out of control. The prosecutor commented that if R.N. "was green he could not sit on the jury."[8]

Defendant contends that the prosecutor's explanations did not rebut the presumption of group bias. Defendant urges that the prosecutor's reasons were insufficient as a matter of law, were not supported by the record of the voir dire, and were inconsistent with the prosecutor's choices to retain on the jury persons having similar characteristics. We conclude, to the contrary, that the prosecutor's justifications were facially neutral, based upon "specific" or "individual" bias as opposed to group bias, similar to or the same as justifications we have upheld in other cases, and supported by the record of the voir dire. Accordingly, we reject defendant's claims.

■ As an initial matter, we note that several of those excused— Prospective Jurors R.H. and R.N., and Prospective Alternate Jurors M.M. and R.F.—held substantially negative views regarding the death penalty. A prosecutor may exercise peremptory challenges against prospective jurors who are not so intractably opposed to the death penalty that they are

---

[8] On appeal, defendant does not challenge the prosecutor's reasons for excusing J.F. and E.O. J.F., whom the prosecutor earlier unsuccessfully challenged for cause, could not imagine circumstances in which she could impose the death penalty, and the prosecutor continued to believe her ability to follow the law was "substantially impaired." E.O. was habitually late and once had failed to appear, and had a prior jury experience in which she was "positive" that the person was not guilty. The prosecutor also observed the jury included A.A., who was African-American, and D.D., who was "at least one-half Japanese."

subject to challenge for cause under the *Witherspoon-Witt* standard, but who nonetheless are substantially opposed to the death penalty. (*Zambrano, supra,* 41 Cal.4th at pp. 1104–1109; *People v. Jurado* (2006) 38 Cal.4th 72, 106 [41 Cal.Rptr.3d 319, 131 P.3d 400].)

In other respects, the excused prospective jurors embodied characteristics, or communicated views, that justified the prosecutor's exercise of peremptory challenges. Prospective Juror G.P.'s answers during *Hovey* voir dire (*Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]) confirm that she lacked the maturity to act as a juror in the present case, as reflected by her focus on the attention she had received at work because of the possibility she would be selected as a juror in this case, and on the useful experience she might acquire as a result. G.P. explained that she was a legal assistant secretary and was taking classes for certification in that field. When asked specifically how she would feel about having someone else's life in her hands, G.P.'s enthusiastic and generalized response did not reflect she appreciated the gravity of that responsibility. G.P. was "not reluctant" to decide whether somebody "will live or die," and felt comfortable with that role. (See *People v. Sims* (1993) 5 Cal.4th 405, 429–430 [20 Cal.Rptr.2d 537, 853 P.2d 992] (*Sims*) [upholding peremptory challenge based upon prospective juror's immaturity].)

Prospective Juror J.N., who volunteered extensive information related to his own history of alcoholism, reasonably was excused on the basis that his life experiences, including his court-martial and his excessive alcohol consumption (resulting in abusive behavior toward his family), might predispose him to bias in favor of the accused. The record also confirms the prosecutor's explanation that J.N. was less than direct in responding to questions related to his views regarding the death penalty. (See *People v. Montiel* (1993) 5 Cal.4th 877, 909 [21 Cal.Rptr.2d 705, 855 P.2d 1277] [finding excusal valid based upon the prospective juror's manner of answering questions].)

The record of Prospective Juror R.H.'s views concerning the death penalty—reflecting that her mother raised her to believe that only God can decide who lives and who dies, and that she did not "feel that the death penalty is right"—confirms the prosecutor's comments. R.H.'s relative youth and related immaturity were reasonable grounds for her excusal. (*Sims, supra,* 5 Cal.4th at pp. 429–430; see *People v. Arias* (1996) 13 Cal.4th 92, 139 [51 Cal.Rptr.2d 770, 913 P.2d 980].) R.H.'s relationship and contact with an incarcerated individual was an appropriate ground for excusal. (See *People v. Panah* (2005) 35 Cal.4th 395, 442 [25 Cal.Rptr.3d 672, 107 P.3d 790] (*Panah*) ["A negative experience with police or the arrest of a prospective juror or a close relative is a gender-neutral reason for exclusion."]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1281–1282 & fn. 22 [18 Cal.Rptr.2d 796, 850 P.2d 1].)

Although the record of Prospective Juror R.N.'s voir dire reflects his assertion that he could return a death verdict if the facts so warranted, his statement on his juror questionnaire that "no human has the right to take another's life" could cause the prosecutor legitimate concern about R.N.'s ability to vote in favor of the death penalty. (Cf. *People v. Hoyos* (2007) 41 Cal.4th 872, 902 [63 Cal.Rptr.3d 1, 162 P.3d 528]; *People v. Thornton* (2007) 41 Cal.4th 391, 418 [61 Cal.Rptr.3d 461, 161 P.3d 3] (*Thornton*); *McDermott, supra,* 28 Cal.4th at pp. 974–975.) When R.N. was asked during voir dire what he recalled hearing about defendant's case, R.N.'s description of the information he had received—including that drugs were involved, and that defendant's wife was unfaithful to him—was consistent with the prosecutor's stated concern, based on R.N's questionnaire responses, that R.N. might feel these circumstances justified or mitigated defendant's actions.[9]

For the first time on appeal, defendant identifies eight jurors (each of whom ultimately sat on the jury panel) who he contends gave responses that were materially similar to those given by certain prospective jurors who were excused by the prosecutor. Although we previously have declined to engage in comparative juror analysis as an initial matter on appeal, in *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] the high court examined the veracity of the prosecutor's stated race-neutral reasons for the challenged excusals notwithstanding a similar absence of comparative analysis at trial. Following that decision, we have assumed, without deciding, that we must undertake comparative juror analysis in these circumstances. (*Zambrano, supra,* 41 Cal.4th at p. 1109; *Lewis and Oliver, supra,* 39 Cal.4th at p. 1017; *Schmeck, supra,* 37 Cal.4th at p. 270; *Ward, supra,* 36 Cal.4th at p. 203; cf. *Bonilla, supra,* 41 Cal.4th at p. 350 [*Miller-El v. Dretke* does not require comparative juror analysis in a "first-stage" *Wheeler-Batson* case; denial of motion on the ground defendant failed to make a prima facie case].) More recently, in *Snyder, supra,* 552 U.S. 472, ___, fn. 2 [128 S.Ct. 1203, 1211, fn. 2], the high court engaged in that practice, and we shall do the same.

We compare the responses of the challenged prospective jurors with those of several jurors who served and, according to defendant, did not respond in a manner materially different from that of the challenged jurors, and who shared characteristics with those challenged. That exercise, however, does not persuade us that the prosecutor's challenges were based upon race or ethnicity rather than upon specific bona fide reasons.

Defendant suggests that in explaining her opposition to the death penalty based upon her mother's admonition that "only God can take a life,"

---

[9] The excusal of these prospective jurors was not based to any substantial degree upon their demeanor not reflected in the record. (Cf. *Snyder, supra,* 552 U.S. at pp. ___–___ [128 S.Ct. at pp. 1208–1209].)

Prospective Juror R.H.'s response was not materially different from those of sitting jurors A.A., J.M., and C.M. These jurors did not answer questions concerning the death penalty in a manner suggesting it was not their place to make a life-or-death decision, or reflecting the strong influence of a close relative, as R.H. did in relating her mother's general admonition and R.H.'s specific opinion that defendant should not receive the death penalty. A.A. indicated that it would take a very serious crime for her to punish someone with death, and that she could vote for the death penalty if the crime were sufficiently serious, heinous, and vicious. J.M. indicated she would vote for the death penalty if the issue were presented to the voters in a referendum election, and she felt "we have the best judicial system in the world, much more fair than most." In contrast to R.H., who visited her boyfriend in jail, C.M. had numerous ties to law enforcement, and her husband was a former prosecutor. C.M. felt the death penalty was needed for some crimes, and "[h]opefully some crimes would not be committed if the criminal knew the consequences."

Prospective Juror J.N. was excused on the basis that he had been violent and abusive to his family during a period when he was drinking, was of doubtful stability, and was not direct in explaining his views regarding the death penalty. Defendant suggests that Prospective Juror J.N. did not give responses that were materially different from those of Jurors D.D., D.H., and D.A., and Alternate Juror V.B., who indicated that incidents arising from alcohol or drug use had occurred in their families. These jurors were more forthcoming as to their views concerning the death penalty. They did not have a lengthy personal history involving alcohol abuse related to violence with family members or changes in personality, and did not state that persons consuming alcohol or drugs sometimes "behave like an animal," as did J.N.

As defendant observes, Prospective Juror R.N. stated he could sit on the jury and return a death penalty if that was appropriate, and referred to the rule of "an eye for an eye." R.N. also expressed reservations concerning the death penalty, and referred to the biblical prohibition against killing. R.N. disclosed he had observed defendant in handcuffs during his televised statement after his arrest, and learned from news accounts that defendant's wife had been unfaithful to him.

Defendant suggests that R.N.'s responses were not materially different from those of Jurors A.A. and J.T. relating to the death penalty and to their knowledge of the circumstances of the case, because their responses also indicated that defendant may have been on drugs, or may not have been in his right mind. A.A., who was employed in the child-support division of the district attorney's office, stated she accepted the death penalty. Her answers did not suggest that circumstances such as the consumption of drugs or

infidelity might justify or mitigate the conduct about which she had heard. J.T. said she thought "God has put people on earth to be judges and that's one of the things that He may have called people to do, and if that's called for [with regard to] the death penalty, then I think it's my obligation to do that." She also stated that if the evidence proved defendant had committed the murders, it did not make much difference why he had done so. These responses were not materially similar to those of R.N.

Defendant points out that Prospective Alternate Juror M.M., in addition to indicating she could not imagine a crime in which she would find the death penalty appropriate, also stated she could consider the death penalty and was not unequivocally opposed to it, and could be a fair and impartial juror. Her statements, considered in total, reflected far stronger opposition to the death penalty than those of the sitting jurors or alternate jurors.

Defendant indicates, similarly, that Prospective Alternate Juror R.F. responded to questions regarding his views concerning the death penalty in a manner much more equivocal than was suggested by the prosecutor in excusing him because of opposition to the death penalty. Defendant also suggests that R.F.'s responses had much in common with those of Juror D.A., who stated he had mixed feelings about, or was reluctant to impose, the death penalty. R.F. explained that he believed the death penalty is arbitrarily applied from state to state, that its imposition traumatizes the defendant's family just as a defendant's crimes traumatize the victims' families, and that he would eliminate the death penalty were it within his power to do so. Those responses reflect a much more considered and profound opposition to the death penalty than those of D.A., who did not have any sense what he would do if the death penalty were the subject of an election, and did not wish to, yet could, decide whether imposition of that punishment was appropriate. The responses of R.F. and D.A. on other subjects, such as respect for the opinions of mental health professionals on behavioral motivation, also were dissimilar.

Defendant suggests that Prospective Juror G.P.'s responses do not support the prosecutor's assessment that she was too anxious, immature, and insufficiently aware of her responsibility to serve as a juror in the present case. As discussed above, G.P.'s responses, in light of her background, confirm she was unsuitable for the grave responsibility of becoming a juror in the present case. The jurors chosen displayed a much greater ability to decide guilt and (if necessary) punishment in a careful and fair manner, and did not emphasize that the prospect of becoming a juror provided an opportunity for personal growth.

Finally, defendant claims the trial court failed "in its duty to inquire and evaluate" the prosecutor's explanations for the excusal of each prospective

juror, by determining whether a valid reason existed that "actually prompted the prosecutor's exercise of the particular peremptory challenge." (Citing *People v. Fuentes* (1991) 54 Cal.3d 707, 720 [286 Cal.Rptr. 792, 818 P.2d 75].) As explained above, the trial court denied the defense motion on the basis that defendant had failed to make a prima facie case. Therefore, the prosecutor was not required to provide reasons for his challenges, nor was the court required to determine the validity and sincerity of any reasons that were proffered. Our assumption on appeal that a prima facie case was made does not alter the trial court's duties at trial.

Moreover, as described above, during the hearing on the *Wheeler/Batson* motion the trial court placed on the record its observations that the prosecutor had not exercised challenges or otherwise conducted himself in a manner suggesting any discriminatory motive. After the prosecutor stated his reasons, the trial court reiterated that defendant had failed to make a prima facie case, but also noted "the prosecutor has a rational basis for each of these [peremptories]."

We find no *Wheeler/Batson* error.

7. *The prosecution's peremptory challenges of "death penalty skeptics"*

Defendant contends that despite his objections, the prosecution utilized its peremptory challenges systematically to excuse prospective jurors who, although not unalterably opposed to the death penalty, nonetheless expressed skepticism concerning that punishment. Defendant identifies Prospective Jurors B.H., A.N., D.C., and J.F., asserting that the removal of these jurors violated his federal and state rights to due process of law, equal protection of the laws, an impartial jury drawn from a fair cross-section of the community, and a reliable determination of his guilt and appropriate penalty. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 1, 7, 15, 16 & 17.)

As defendant recognizes, we have rejected this claim on numerous prior occasions. "Skepticism about the death penalty is a permissible basis for a prosecutor's exercise of a peremptory challenge." (*People v. Jurado, supra*, 38 Cal.4th at p. 106; see, e.g., *Ward, supra*, 36 Cal.4th at pp. 201–202; *Panah, supra*, 35 Cal.4th at p. 441; *McDermott, supra*, 28 Cal.4th at pp. 970–971; *People v. Jackson* (1996) 13 Cal.4th 1164, 1200 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Defendant does not offer any compelling reason to depart from our precedent, and we reject this claim, as we have in past cases.

8. *Motion for discovery of personnel files of officers and DEA agent present during defendant's arrest and return to the United States*

Prior to trial, defendant moved pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 536–537 [113 Cal.Rptr. 897, 522 P.2d 305], for discovery of the personnel files of the law enforcement officials present during defendant's return flight from Mexico to the United States in which he made incriminating statements. Defendant sought the files of Sonoma County Sheriff's Detectives David Edmonds, Larry Doherty, Frank Trejo, Dave Sederholm, and Mike Brown, and LAPD Officer Arturo Zorilla, as well as the files of DEA Agent Joseph Martinez, who was not present on that flight. In a separate motion, defendant sought the personnel files of DEA Agent Martinez, who was present at defendant's arrest. In the motion, defendant asserted on information and belief that "[t]he manner in which the United States and Mexican Federal Agents obtained this original statement suggests a pattern of selective harassing conduct and coercive practices by the above-named DEA agent in excess of that required by an agent to carry out the duties of his office."

At the hearing on the motion, the prosecutor stated that neither the Sonoma County Counsel nor the Los Angeles City Attorney could represent the DEA in regard to Agent Martinez, that the district attorney's office had requested Martinez's personnel records through the United States Department of Justice, but that the request was denied because it was DEA policy to release personnel records only on order of a court having competent jurisdiction. The responses to defendant's motion also pointed out that, unlike the other officers whose personnel files had been sought, Agent Martinez was not on the return flight with defendant. In addition, the issue concerning statements made by defendant to Mexican officials in the presence of Agent Martinez had been litigated previously in the context of the hearing on the voluntariness of defendant's confession, and Martinez had been cross-examined at that time concerning his role.

The trial court granted the motion with regard to the personnel records of the officials present during defendant's return flight and examined those records in camera, finding that none of them should be released. The trial court indicated with respect to Agent Martinez that it did not have jurisdiction to order the United States Attorney into court, could not enter an ex parte order in the absence of counsel, and lacked authority to order production of the records.

Defendant contends the trial court erred in failing to order discovery of the records of Agent Martinez. "On a showing of good cause a criminal

defendant is entitled to discovery of relevant documents or information in the personnel records of a police officer accused of misconduct against the defendant. (Evid. Code, § 1043, subd. (b).)" (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1016 [29 Cal.Rptr.3d 2, 112 P.3d 2].) To determine whether the good cause requirement has been met, a trial court must consider whether the defense has established (1) that the information is material to the subject matter of the pending litigation, and (2) " 'a "reasonable belief" that the agency has the type of information sought.' " (*Ibid.*) The defense must demonstrate a logical connection between the charges and the proposed defense, and also " 'articulate how the discovery being sought would support such a defense or how it would impeach the officer's version of events.' " (*Garcia v. Superior Court* (2007) 42 Cal.4th 63, 71 [63 Cal.Rptr.3d 948, 163 P.3d 939].) "The information sought must be described with some specificity to ensure that the defendant's request" is confined to the instances of officer misconduct related to what has been claimed by the defendant. (*Ibid.*)

The trial court did not abuse its discretion in denying the discovery motion as to Agent Martinez. As discussed above, when the voluntariness of defendant's confession previously was litigated, defendant's statements were found to be voluntary. In connection with those proceedings, the circumstances of defendant's arrest and transportation to Mexico City in the custody of Mexican officials also had been explored, and it was established that Agent Martinez was present but did not participate in the arrest, that he told the foreign officials to treat defendant well and not question him, that defendant had not been abused while in Mexican custody, and that the failure of foreign officials to advise defendant of his *Miranda* rights had not affected the statements he made to American officials.

### 9. *Admission of evidence suggesting that defendant molested the Richards girls*

Defendant contends the trial court erred in admitting evidence establishing that victims Ruth and Marie Richards were sexually molested at the time of the murders. The challenged evidence included (1) the portion of defendant's tape-recorded account of the murders when he was asked concerning, and vigorously denied committing, any sexual crimes with regard to these victims, (2) the testimony of an evidence technician and of a sheriff's deputy who first arrived at the Richards crime scene concerning the positions and condition of the bodies, and (3) the victims' bloody underpants. At the guilt phase, a single photograph depicting victim Ruth Richards at the scene lying prone, with her legs spread apart, underpants wrapped around one ankle, a bloody handprint on her buttocks, and blood smears consistent with the body's having been moved, also was admitted into evidence. At the penalty phase, a

similar photograph of Marie Richards was admitted into evidence. Defendant's claim as it relates to that evidence is discussed below.

At trial, the defense attempted to eliminate or reduce the impact of evidence suggesting any sexual misconduct with these victims. The defense moved in limine to exclude any photographic evidence of suggestive positioning of the bodies, and was successful to the extent of limiting the admission of the photographs to the two described above. The defense moved to redact the portion of defendant's tape-recorded interview and confession concerning removal of the victims' underwear and the presence of bloody handprints on their legs and thighs, to exclude the evidence of the victims' bloody underpants, and twice requested a mistrial during the prosecutor's examination of the evidence technician, who was asked to describe the condition of the bodies by referring to additional photographs not permitted to be shown directly to the jury. These motions were denied.

■■■ Defendant asserts the evidence was irrelevant to any material issue of disputed fact, observing that at trial he offered to stipulate to the admission of evidence relating to the positions and condition of the bodies. Relevant evidence is that "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The concept of relevance is very broad (*People v. Scheid* (1997) 16 Cal.4th 1, 16 [65 Cal.Rptr.2d 348, 939 P.2d 748]), encompassing evidence depicting the crime scene and injuries inflicted (*People v. Heard* (2003) 31 Cal.4th 946, 972–974 [4 Cal.Rptr.3d 131, 75 P.3d 53]), and that bearing on the defendant's account of events and state of mind. Here, the evidence also tended to establish defendant's attitude toward his victims and that he acted methodically and deliberately rather than as the result of uncontrollable impulses arising from his ingestion of drugs and alcohol. (*Heard, supra,* 31 Cal.4th at pp. 972–974; *People v. Carpenter* (1997) 15 Cal.4th 312, 410 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Crittenden* (1994) 9 Cal.4th 83, 133–134 [36 Cal.Rptr.2d 474, 885 P.2d 887].) In addition, the prosecution is not required to accept a stipulation " 'if the effect would be to deprive the state's case of its persuasiveness and forcefulness,' " nor is it "obligated to present its case in the sanitized fashion suggested by the defense." (*People v. Garceau* (1993) 6 Cal.4th 140, 182 [24 Cal.Rptr.2d 664, 862 P.2d 664] (*Garceau*); see *People v. Bradford* (1997) 14 Cal.4th 1005, 1050–1051 [60 Cal.Rptr.2d 225, 929 P.2d 544]; *People v. Pinholster* (1992) 1 Cal.4th 865, 959 [4 Cal.Rptr.2d 765, 824 P.2d 571].) The prosecutor need not stipulate to proof in place of photographic evidence. (*Bradford, supra,* 14 Cal.4th at pp. 1050–1051.)

■■■ Defendant also contends the trial court erred in failing to exclude the evidence as substantially more prejudicial than probative under Evidence Code

section 352, and to engage in the weighing process required by that statute. The circumstance that evidence is adverse to a defendant's case does not render it prejudicial within the meaning of section 352. (*People v. Padilla* (1995) 11 Cal.4th 891, 925 [47 Cal.Rptr.2d 426, 906 P.2d 388] (*Padilla*).) In applying this statute we evaluate the "risk of '*undue*' prejudice, that is, ' "evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues," ' not the prejudice 'that naturally flows from relevant, highly probative evidence.' " (*Padilla, supra*, 11 Cal.4th at p. 925; see *People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d 456, 892 P.2d 1199]; *People v. Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189].) In particular, we have rejected the claim that the "sexually suggestive nature" of photographs of a murder victim created undue prejudice, because "it was the nature of the crime . . . that made it necessary for the jury to see her without clothes." (*People v. Navarette* (2003) 30 Cal.4th 458, 496 [133 Cal.Rptr.2d 89, 66 P.3d 1182] (*Navarette*).)

In the present case, the trial court carefully restricted the photographic evidence of the victims and limited presentation of the crime scene details largely to the information provided through witnesses such as the evidence technician, who referred to photographs that were not exhibited to the jurors. It is evident the trial court weighed the prejudicial impact of that and other evidence against its probative value, determining the evidence was admissible. (Cf. *Navarette, supra*, 30 Cal.4th at p. 495.) Having reviewed the photographic evidence in question, we conclude the trial court did not abuse its discretion in determining that the risk of undue prejudice from its admission did not substantially outweigh its probative value.

Defendant suggests the jurors must have assigned undue weight to Detective David Edmonds's statement, during his in-flight interview with defendant, that Edmonds believed defendant molested these victims. In the context of the jury's consideration of defendant's entire confession, we conclude Edmonds's comments reflect nothing more than appropriate questioning regarding defendant's account of the crimes and could not have had any undue impact on the jury.

### 10. Admission of asserted victim-impact evidence at the guilt phase

Defendant contends the trial court erred in admitting the testimony of victim Tracey Toovey's wife, Catherine. Defendant asserts that her testimony was irrelevant; "substantially more prejudicial than probative," and thus inadmissible pursuant to Evidence Code section 352; that it amounted to "victim impact evidence" inadmissible at the guilt phase; and that its

admission at that phase violated defendant's right to due process of law under the Fourteenth Amendment to the federal Constitution.

Prior to commencement of the guilt phase, the defense offered to stipulate to any facts to which Catherine Toovey might testify, because she had been extremely emotional in testifying at the preliminary hearing. The defense suggested the prosecutor intended to present her testimony, which would be cumulative of that provided by other witnesses, solely to inflame the jury. The prosecutor argued that Mrs. Toovey's testimony was necessary to identify her husband and describe his actions on the morning he was murdered. Following a colloquy between the trial court and the prosecutor regarding this potential testimony, the court indicated Mrs. Toovey's testimony was unnecessary to establish Toovey's identity. After the prosecutor reiterated that the testimony would establish the time of Toovey's departure and other relevant times, the court required the prosecutor to make an offer of proof prior to calling her to testify.

In his subsequent offer of proof, the prosecutor explained Mrs. Toovey would identify this victim as her husband and further testify that he departed for work 10 minutes prior to 8:00 a.m. on the day of the murder, that his drive from their residence to Grand Cru Vineyard was approximately five minutes in duration, and that recently he had been leaving for work an hour earlier than in the past—which was relevant because, in his confession, defendant stated he knew Toovey had been going to work an hour earlier. The prosecutor stated that, because the trial court had denied his motion to introduce Toovey's autopsy photographs, Mrs. Toovey's testimony was necessary to identify her husband and his automobile as depicted in an aerial photograph of the crime scene.

Defense counsel then offered to stipulate to those facts in order to avoid the possibility that Mrs. Toovey would "break down" on the witness stand (as she had at the earlier hearing), thereby creating undue sympathy for the victim's family and prejudicing the defense. The prosecutor then explained to the court that at the preliminary hearing, when he returned to counsel's table, he inadvertently had left an autopsy photograph in front of Mrs. Toovey on the witness stand, and the prosecutor did not intend to show the photograph to her at trial or expect her to have the same reaction. In response, defense counsel argued the testimony was extremely prejudicial victim-impact evidence. The trial court observed the testimony in question was cumulative and potentially highly prejudicial, and reserved its ruling pending the prosecution's presentation of other evidence on those issues.

When the prosecutor approached the conclusion of his case-in-chief, he requested a ruling on the issue of Mrs. Toovey's intended testimony. Defense

counsel objected on the grounds of undue prejudice under Evidence Code section 352 and violation of due process under the federal Constitution, and repeated his offer to stipulate to the evidence in question. The prosecution reiterated its offer of proof and stated that, in addition, Mrs. Toovey would testify she was aware of the tension or difficulty that existed between her husband and defendant. The prosecutor represented that Mrs. Toovey would not break down and become emotional on the witness stand. The trial court then overruled the defense objection.

Mrs. Toovey proceeded to testify concerning the time her husband departed for work, explaining that recently he had been reporting to work and departing from work an hour earlier than previously in order to pick up their daughter after school so that Mrs. Toovey would not have to drive during her pregnancy. Mrs. Toovey identified her husband in the aerial photograph. She testified she was aware of a conflict between her husband and defendant, and explained that defendant had some ability to speak English. She did not become emotional on the witness stand.

Defendant contends this evidence was irrelevant and inadmissible in view of the circumstance that defendant offered to stipulate to the substance of Mrs. Toovey's testimony. That testimony, however, was relevant to the credibility and reliability of various witnesses and of defendant, whose account of events and of his state of mind were at issue. As indicated above, the prosecution is not required to accept a stipulation that would deprive its case of its effectiveness, or to present its case in the manner preferred by the defense. (*Garceau, supra,* 6 Cal.4th at p. 182; *People v. Pinholster, supra,* 1 Cal.4th at p. 959.)

Defendant also asserts Mrs. Toovey's testimony recounting the last time she saw her husband alive likely would inflame the emotions of the jury, as would her demeanor, and thus was substantially more prejudicial than probative under Evidence Code section 352. The trial court properly determined her testimony did not create undue prejudice either in its substance or its presentation. The court deferred ruling on the admissibility of this testimony in order to consider whether it was necessary in light of other evidence, restricted the prosecutor's display of photographs relating to the evidence in question, and secured the prosecutor's promise the witness would not suffer an emotional breakdown during her testimony. Mrs. Toovey's account of her husband's departure and her identification of him in the aerial crime scene photograph scarcely would evoke an exceptional emotional bias against defendant as an individual. (*Padilla, supra,* 11 Cal.4th at p. 925; *People v. Karis, supra,* 46 Cal.3d at p. 638.)

Defendant also urges that introduction of this testimony amounted to victim-impact evidence that is inadmissible at the guilt phase. We have

recognized that a prosecutor's argument to the jury that "appeal[s] for sympathy for the victim is out of place during an objective determination of guilt." (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 [17 Cal.Rptr.2d 174, 846 P.2d 756]; see *People v. Millwee* (1998) 18 Cal.4th 96, 137 [74 Cal.Rptr.2d 418, 954 P.2d 990].) Similarly, the prosecutor's introduction of victim-impact testimony is impermissible at the guilt phase of a capital trial. (See *People v. Taylor* (2001) 26 Cal.4th 1155, 1171–1172 [113 Cal.Rptr.2d 827, 34 P.3d 937] (*Taylor*); *People v. Frye* (1998) 18 Cal.4th 894, 974–975 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

In the present case, however, Mrs. Toovey's testimony scarcely touched upon the victim's family life and did not relate the effect of defendant's acts upon family members. (See *Taylor, supra,* 26 Cal.4th at pp. 1171–1172, 1182 [at the guilt phase, physician's testimony regarding the extent of the victim's injuries was not victim-impact evidence; at the penalty phase, family members' testimony concerning the various ways they were affected adversely by loss of the victim's care and companionship was admissible victim-impact evidence]; cf. *Thornton, supra,* 41 Cal.4th at p. 406 [at the penalty phase, the mother of the victim testified the victim was her only daughter, whose murder left the victim's young son motherless].)

 Defendant asserts, nonetheless, that the admission of this testimony "infected the guilt and penalty phases" of the trial in violation of defendant's federal constitutional rights. Defendant relies in part upon *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] and *South Carolina v. Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207], prohibiting the admission of victim-impact evidence even during the penalty phase of a capital trial. In *Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597], the high court overruled those decisions, holding that a state is free to determine that victim-impact evidence demonstrating specific harm caused by the defendant's crimes is relevant to a jury's assessment of a defendant's moral culpability. (*Id.* at p. 819; see *People v. Roldan* (2005) 35 Cal.4th 646, 732 [27 Cal.Rptr.3d 360, 110 P.3d 289] [ex post facto principles are not violated by applying the *Payne* rule to cases in which the crimes precede that decision].) Under our law, evidence of specific harm, including the impact on the family of the victim caused by the defendant's acts, is a circumstance of the crime and is therefore admissible pursuant to section 190.3, factor (a). (*People v. Kelly* (2007) 42 Cal.4th 763, 793 [68 Cal.Rptr.3d 531, 171 P.3d 548]; *People v. Edwards* (1991) 54 Cal.3d 787, 833–836 [1 Cal.Rptr.2d 696, 819 P.2d 436]; 3 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Punishment, § 472, pp. 631–632.) In the event the jurors at the penalty phase considered Mrs. Toovey's brief guilt phase testimony concerning her husband, the jurors were entitled to consider that and all other circumstances of the crimes.

11. *Prosecutorial misconduct affecting right to a fair trial at both phases of the proceedings*

 Defendant raises several claims of prosecutorial misconduct in the misuse of voir dire in commenting upon defendant's failure to testify, in indoctrinating potential jurors, in proffering evidence of defendant's sexual misconduct with the Richards girls, and in impugning the motives of defense counsel and a defense expert. Prior to examining these claims, we recall the general principles governing a prosecutor's conduct during trial in the context of a claim of prosecutorial misconduct. "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the *federal* Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; see *People v. Cash* (2002) 28 Cal.4th 703, 733 [122 Cal.Rptr.2d 545, 50 P.3d 332].) Under *state law,* a prosecutor who uses deceptive or reprehensible methods commits misconduct even when those actions do not result in a fundamentally unfair trial. [Citation.]" (*People v. Cook* (2006) 39 Cal.4th 566, 606 [47 Cal.Rptr.3d 22, 139 P.3d 492], italics added; see *People v. Lopez* (2008) 42 Cal.4th 960, 965 [71 Cal.Rptr.3d 253, 175 P.3d 4] (*Lopez*); *People v. Hoyos, supra,* 41 Cal.4th at p. 923; *People v. Ledesma* (2006) 39 Cal.4th 641, 726 [47 Cal.Rptr.3d 326, 140 P.3d 657].)

"A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." (*Thornton, supra,* 41 Cal.4th at p. 454.) "A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel," but the appellate record rarely demonstrates "that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored." (*Lopez, supra,* 42 Cal.4th at p. 966; see *People v. Mendoza-Tello* (1997) 15 Cal.4th 264, 267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

a. *Voir dire: assertion that defendant was the "best source" of his state of mind*

Defendant contends that the prosecutor committed misconduct by repeatedly questioning potential jurors during voir dire, and by recalling those questions during closing argument, in a manner designed to emphasize that jurors should consider *defendant's* statements to be the best source of his

state of mind during the commission of the murders. Defendant asserts the prosecutor thereby committed error under *Griffin v. California* (1965) 380 U.S. 609, 611 [14 L.Ed.2d 106, 85 S.Ct. 1229] (*Griffin*), and also impermissibly attempted to indoctrinate the jury to discount expert testimony concerning defendant's mental state.

In the course of general voir dire, during which three of the jurors who eventually served on the case were present—D.D., D.H., and J.M.—the prosecutor posed questions to several potential jurors relating to whether on a particular date, the potential juror or instead someone else would have been the best source of information concerning that potential juror's state of mind, suggesting in effect that the best source would be the potential juror himself or herself. After a prospective juror (who did not serve on the jury) asked for clarification, the prosecutor indicated "the best . . . question is obviously going to be not what's in my mind or your mind at any given time during this trial but what was in Mr. Salcido's mind." The prospective juror then commented that defendant was not on the witness list. The trial court explained that this circumstance did not necessarily signify defendant would not testify as a witness.

After further exchange with the prospective juror on a different topic, the prosecutor indicated that the question he "was trying to ask" was that "if people give opinions about what other people are thinking at a given moment and what I'm raising to you is that we should look with some caution about those kinds of opinions, and if we have available to us more direct evidence, perhaps of what a person is feeling or what a person did and why they did it, then we ought to look to that as well. So that's all I'm trying to get at."

After the voir dire of prospective jurors concluded for the day, the trial court and counsel outside the presence of the jury discussed scheduling and evidentiary issues. At that point, defense counsel objected to the foregoing questioning by the prosecutor as improper comment on defendant's failure to testify, in violation of *Griffin*, and requested that the trial court instruct the prosecutor "from now on" not to inquire as to who is "the best judge of what was going on" in defendant's mind. The trial court cautioned the prosecutor against arguing his case in voir dire, and the prosecutor agreed to phrase his questions more accurately.

It is apparent that defendant failed to timely object during voir dire to the prosecutor's line of questioning and thus has forfeited this claim on appeal. Moreover, in response to defendant's belated objection and request, the trial court instructed the prosecutor to refrain from questioning any additional potential jurors in that manner. (*People v. Lewis* (2001) 25 Cal.4th 610, 670 [106 Cal.Rptr.2d 629, 22 P.3d 392].) The prosecutor did not press the matter

in closing argument. Finally, the prosecutor's questions do not reflect that his sole purpose was to indoctrinate the potential jurors. (See *People v. Fierro* (1991) 1 Cal.4th 173, 209 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) Accordingly, we reject defendant's claim.

### b. *Voir dire: additional indoctrination of the jury*

Defendant asserts that the prosecutor otherwise attempted to indoctrinate potential jurors by questioning them regarding their experiences relating to alcohol consumption, specifically with regard to its effect on their capacity to make decisions. This questioning did not improperly attempt to educate potential jurors concerning the facts of the case or to secure their votes, and thus was proper. (See *People v. Fierro, supra,* 1 Cal.4th at p. 209.)

### c. *Proffer of unredacted statements and evidence of sexual misconduct*

Defendant contends that the prosecutor introduced grossly inflammatory evidence of defendant's sexual misconduct with the Richards girls. As explained above, the testimony and related evidence properly were admitted.

### d. *Impugning defense counsel and defense expert*

Defendant contends the prosecutor impugned the motives of defense expert Dr. Crinella by, among other things, suggesting his testimony was the result of his long friendship with defense counsel. Defendant forfeited his present claim of prosecutorial misconduct by failing to object at trial and seek an admonition. (*Prince, supra,* 40 Cal.4th 1179, 1244; *People v. Welch* (1999) 20 Cal.4th 701, 753 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Even assuming this claim was not waived, the prosecutor has considerable leeway in suggesting an expert may testify a certain way for financial gain or other reasons, without committing misconduct. (*People v. Monterroso* (2004) 34 Cal.4th 743, 784 [22 Cal.Rptr.3d 1, 101 P.3d 956].)

### 12. *Jury instruction (CALJIC No. 2.02)*

Defendant asserts that following presentation of the guilt phase evidence, the trial court erred in giving a pattern instruction, CALJIC No. 2.02, defining the nature and sufficiency of circumstantial evidence to prove specific intent and mental state, in violation of defendant's rights under the federal (U.S.

Const., 5th, 6th, 8th & 14th Amends.) and state (Cal. Const., art. I, § 15) Constitutions.[10]

Defendant maintains this instruction improperly required the jury to decide between defendant's guilt and innocence, by shifting the burden of proof from the prosecution and implying that defendant was required to present a "reasonable" defense to the prosecution's case. Alternately, defendant contends the instruction operated as a mandatory, conclusive presumption, reducing the prosecution's burden to prove defendant guilty beyond a reasonable doubt. Defendant asserts the instruction suggested that the jury could accept evidence as incriminatory if it "appeared reasonable" to do so, lowering the standard of proof substantially below that of proof beyond a reasonable doubt. Defendant emphasizes the statement that if one interpretation of the evidence "*appears to be reasonable*" and the other unreasonable, the jury "must accept the reasonable and reject the unreasonable interpretation."

The Attorney General responds that defendant has forfeited this claim on appeal because he did not object to the instruction at trial. Despite defendant's failure to object, this instructional claim may be raised initially on appeal to the extent it implicates his substantial rights. (§ 1259; see *People v. Carey* (2007) 41 Cal.4th 109, 129–130 [59 Cal.Rptr.3d 172, 158 P.3d 743] (*Carey*); *People v. Gray* (2005) 37 Cal.4th 168, 235 [33 Cal.Rptr.3d 451, 118 P.3d 496].) Because defendant contends the instruction reduced the prosecutor's burden of proof, thus affecting one of his fundamental constitutional rights, we entertain the claim on its merits.

As defendant concedes, we have rejected similar arguments in the past, generally on the basis that the instruction merely requires the jury to reject unreasonable interpretations of the evidence. (See, e.g., *Zambrano, supra,* 41 Cal.4th at p. 1159; *Carey, supra,* 41 Cal.4th at pp. 129–130; *People v. Guerra* (2006) 37 Cal.4th 1067, 1139–1140 [40 Cal.Rptr.3d 118, 129 P.3d 321]; *People v. Crew* (2003) 31 Cal.4th 822, 847 [3 Cal.Rptr.3d 733, 74 P.3d 820]; *People v. Maury* (2003) 30 Cal.4th 342, 428 [133 Cal.Rptr.2d 561,

---

[10] As given to the jury, CALJIC No. 2.02 (1979 rev.) provided: "The specific intent or mental state with which an act is done may be shown by the circumstances surrounding the commission of the act. But you may not find the defendant guilty of any offense charged in the information, unless the proved circumstances are not only (1) consistent with the theory that the defendant had the required specific intent or mental state but (2) cannot be reconciled with any other rational conclusion. [¶] Also, if the evidence as to any such specific intent or mental state is susceptible of two reasonable interpretations, one of which points to the existence of the specific intent or mental state and the other to the absence of the specific intent or mental state, you must adopt that interpretation which points to the absence of the specific intent or mental state. If, on the other hand, one interpretation of the evidence as to the specific intent or mental state appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

68 P.3d 1]; *People v. Hughes* (2002) 27 Cal.4th 287, 298 [116 Cal.Rptr.2d 401, 39 P.3d 432].) Defendant, insisting his case is different because the evidence of specific intent and mental state assertedly was less than compelling, asks that we reconsider our prior views, but we see no reason to do so.

### 13. *Cumulative error*

Defendant contends that the errors claimed above, considered together, eroded the fundamental fairness of the proceedings, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, requiring reversal of his conviction. Most fundamental, in defendant's view, is his seizure in Mexico, the asserted illegality of which deprived the court of jurisdiction to try defendant.

As we have discussed, defendant has not established that error occurred at the guilt phase. Therefore, we do not find that any cumulative deficiency arose from a combination of particular errors requiring reversal. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 422 [64 Cal.Rptr.3d 721, 165 P.3d 512]; *People v. DePriest* (2007) 42 Cal.4th 1, 44 [63 Cal.Rptr.3d 896, 163 P.3d 896]; *People v. Abilez* (2007) 41 Cal.4th 472, 523 [61 Cal.Rptr.3d 526, 161 P.3d 58]; *People v. Sanchez* (1995) 12 Cal.4th 1, 76 [47 Cal.Rptr.2d 843, 906 P.2d 1129].)

### B. *Asserted Errors Affecting the Penalty Phase of Trial*

### 1. *Notice of prosecution evidence in aggravation*

Defendant contends the prosecution unreasonably delayed providing the defense with notice that it intended to offer as evidence in aggravation a photograph of the body of Marie Richards (together with brief foundational testimony by Detective Edmonds) that depicts her lying face up, her nightgown pulled above her waist, her legs spread wide apart, and her underpants wrapped around one ankle—a position suggesting that defendant had sexually abused her prior to her death.[11] Defendant points out that he was not convicted of any sexual crime against this victim, and thus that this particular

---

[11] Defendant's claim that the prosecution failed to provide notice of the evidence it intended to offer in aggravation refers to the following: (1) defendant's lack of remorse for his crimes and (2) the circumstance that the penalty of life in prison without possibility of parole would afford defendant "a lifetime of unfettered leisurely pursuits." The prosecutor made both of these points in his closing *argument*, but did not offer any related *evidence* in aggravation. The statute requiring the prosecution to provide notice of aggravating evidence (§ 190.3) does not require any notice relating to the prosecution's intended argument. (*People v. Holt* (1997) 15 Cal.4th 619, 691 [63 Cal.Rptr.2d 782, 937 P.2d 213] (*Holt*).) In any event, we shall examine both of these claims as part of defendant's contention that the prosecutor committed misconduct in his closing argument. (See *post*, at pp. 159–160.)

evidence was not exempt from the requirement of pretrial notice afforded "evidence in proof of the offense[s]," set forth in section 190.3. Defendant claims the delay violated various rights, including the right to due process of law, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, and Fourteenth Amendments.

Defendant complains that it was only several days prior to the commencement of the penalty phase on November 5, 1990, that the prosecutor informed the defense of his intention to introduce the photograph of Marie Richards. In response, the People observe that the prosecution moved to admit the photograph on November 1, and that defendant moved to exclude the photograph prior to commencement of the penalty phase several days later. The People also point out that two months earlier, on September 13, 1990, prior to presentation of the guilt phase evidence, the prosecution filed written notice of the proposed penalty phase evidence referring to "the circumstances of the crimes of which the defendant was convicted in the present proceeding." Such evidence would include the photograph. (See *People v. Williams* (2006) 40 Cal.4th 287, 305 [52 Cal.Rptr.3d 268, 148 P.3d 47]; *People v. Farnam* (2002) 28 Cal.4th 107, 174–176 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

██ Section 190.3 provides in part that "[e]xcept for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, *prior to trial.*" (Italics added.) This statute provides pretrial notice but not discovery. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 955 [44 Cal.Rptr.3d 237, 135 P.3d 649].)

"We have construed the phrase 'prior to trial' to mean before the cause is called to trial" (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1070 [5 Cal.Rptr.2d 230, 824 P.2d 1277]), and have interpreted the statute to require the prosecution to provide notice "before the cause is called for trial or as soon thereafter as the prosecution learns of the existence of the evidence. [Citation.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 356 [30 Cal.Rptr.3d 513, 114 P.3d 758].) Although we never have "explain[ed] precisely when a case may be deemed 'called' for trial" (*People v. Johnson* (1993) 6 Cal.4th 1, 51 [23 Cal.Rptr.2d 593, 859 P.2d 673]), it appears the present case was called for trial by the date on which the jury was sworn (Sept. 5, 1990) and the written notice and the motion both were filed by the prosecutor *after* that date. Nothing suggests the prosecution did not learn of the photographic evidence until after the cause was called for trial. Thus, the notice provided did not clearly satisfy the terms of the statute.

Nonetheless, defendant *did* receive general notice well preceding this phase of the trial as well as the opportunity to object to the admission of the photograph. In view of the evidence introduced during the guilt phase suggesting that defendant sexually abused the Richards girls, and the number and the circumstances of defendant's offenses—depicted in other photographs as well as through extensive testimony—there is no reasonable possibility that the provision of earlier notice to the defense would have altered the outcome. The error in delaying notice of evidence in aggravation clearly was harmless.

### 2. Admission of photograph of Marie Richards's body

Defendant also contends the trial court erred in admitting the photograph of Marie Richards's body because it was unduly inflammatory. The prosecutor sought to introduce two such photographs. The trial court conducted a hearing on the motion and admitted a single photograph.

 We have explained that the provisions of the capital sentencing statute rendering evidence of the circumstances of the crime admissible do not deprive the trial court of its traditional discretion to exclude particular items of evidence as unduly inflammatory. (*People v. Box* (2000) 23 Cal.4th 1153, 1201 [99 Cal.Rptr.2d 69, 5 P.3d 130] (*Box*).) Nonetheless, the trial court's discretion to exclude evidence regarding the circumstances of the crime as unduly prejudicial is more circumscribed at the penalty phase than at the guilt phase of a capital murder trial, because the sentencer is expected to weigh the evidence subjectively. (*Ibid.*)

In *People v. Moon* (2005) 37 Cal.4th 1, 34–35 [32 Cal.Rptr.3d 894, 117 P.3d 591] (*Moon*), the trial court excluded photographs of the victims at the guilt phase pursuant to Evidence Code section 352, but permitted the prosecutor to introduce the photographs at the penalty phase. As in *Box, supra,* 23 Cal.4th at page 1201, in *Moon* we upheld the admission of the photographs despite the circumstance they were "bloody and graphic." (*Moon, supra,* 37 Cal.4th at pp. 34–35.) In the present case it is clear the trial court exercised its traditional discretion to consider whether the evidence was unduly inflammatory, deciding to place a quantitative limitation on the evidence. At the same time, the court correctly recognized that at the penalty phase the prosecution had the right to present this particular evidence concerning the circumstances of the crimes. The court did not err.

Moreover, even had the trial court erred in admitting the photograph of Marie Richards suggesting sexual molestation, defendant was not prejudiced by this evidence. Considered in light of the evidence that defendant had decided in advance to commit murder and then, utilizing several different

types of weapons, systematically and efficiently murdered seven victims, including two of his own young daughters, and attempted to murder two others, including a third daughter, there is no reasonable possibility the outcome would have been different had the photograph been excluded. (*Alfaro, supra,* 41 Cal.4th 1277, 1306; *People v. Robinson* (2005) 37 Cal.4th 592, 641–642 [36 Cal.Rptr.3d 760, 124 P.3d 363] (*Robinson*); *People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135] (*Brown*).)

### 3. *Asserted prosecutorial misconduct in closing argument*

Defendant asserts the prosecutor improperly presented evidence and engaged in argument suggesting defendant had sexually molested the Richards girls. Defendant notes that, despite having agreed not to argue that defendant committed sexual misconduct with the Richards girls, (1) in his opening statement the prosecutor told the jury it would view a· photograph depicting victim Marie's "*entire body*," because there was no other way to demonstrate "*what happened*" on April 14, 1989; (2) in cross-examination the prosecutor asked defendant's mother whether defendant told her "*how he had left those victims,*" and (3) in closing argument the prosecutor observed that in addition to killing those victims, defendant "moves those bodies, after slashing their throat[s], *removed their underwear for whatever gruesome reason.*"

Defense counsel failed to object to these statements and has forfeited the claim. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1209 [47 Cal.Rptr.2d 800, 906 P.2d 1068]; *People v. Memro* (1995) 11 Cal.4th 786, 879 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125–1126 [36 Cal.Rptr.2d 235, 885 P.2d 1] (*Rodrigues*).) Defendant's in limine motion to restrict the scope of the prosecutor's penalty phase argument did not preserve the claim on appeal, because defendant did not object to the argument when made. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1406 [58 Cal.Rptr.3d 368, 157 P.3d 973].)

■ Even had defendant not forfeited the claim, the prosecutor's argument did not constitute misconduct. The prosecution properly may point out that the circumstances of the murders suggest possible sexual conduct despite the absence of specific charges of sexual crimes. (*Navarette, supra,* 30 Cal.4th at p. 518.) In any event, there is no reasonable possibility that defendant was prejudiced by oblique references to his having left these young victims partially nude after slashing their throats.

Defendant asserts the prosecutor improperly argued to the jury that it should discount defendant's mitigating evidence. We have concluded such argument does not constitute misconduct. (*People v. Lucero* (2000) 23 Cal.4th 692, 734–735 [97 Cal.Rptr.2d 871, 3 P.3d 248].)

 Defendant asserts the prosecutor improperly referred to defendant's lack of remorse for his crimes as a factor in aggravation. Defendant misconstrues the prosecutor's argument, which did not identify lack of remorse as an aggravating factor. "There is no statutory bar to a logical comment on a defendant's lack of remorse. [Citation.] To the contrary, we have recognized that consideration of lack of remorse is proper. 'A defendant's remorse or lack thereof is a proper subject for the jury's consideration at the penalty phase [citation] and the prosecutor's comment thereon, which lacked any suggestion that the absence of remorse should be deemed a factor in aggravation of the offense, was proper.' [Citation.] The argument did not, as defendant asserts, focus the jury's attention on defendant's failure to testify at the penalty phase. It was clearly directed to the opportunities defendant had to express remorse in his statement to the police and guilt phase testimony." (*Holt, supra*, 15 Cal.4th at p. 691; see *People v. Hughes, supra*, 27 Cal.4th at pp. 393–394.)

Defendant asserts the prosecutor improperly suggested that, if sentenced to life in prison without the possibility of parole, defendant would enjoy a lifetime of "unfettered leisurely pursuits," urging the jury to consider this as a factor in aggravation. We do not believe this assertion properly characterizes the prosecutor's argument. As the People observe, the argument responded to the testimony of defense expert Len Chastain concerning the harsh realities of life in prison without the possibility of parole. The prosecutor pointed out that the expert never had seen defendant prior to attending defendant's trial, and suggested the expert could not predict defendant's future. The prosecutor compared the activities engaged in by ordinary persons during leisure time, such as reading, watching television, writing letters, or communicating with friends or relatives and suggested those activities also would be available to defendant even in a maximum security prison. The prosecutor properly could argue that the expert's testimony should be discounted (*People v. Arias, supra*, 13 Cal.4th at p. 182), and in doing so he did not suggest that the availability in prison of some activities of normal life constituted a circumstance in aggravation.

Defendant complains of the prosecutor's argument that the death penalty was appropriate in view of the seriousness of the crimes, that defendant was not deserving of sympathy, and that the jury had the responsibility to return a proper verdict. Argument that death is appropriate in light of the gravity of the crimes is permissible. (*Navarette, supra*, 30 Cal.4th at p. 518.) The prosecution properly may argue that a defendant is undeserving of sympathy. (*People v. Dennis* (1998) 17 Cal.4th 468, 548 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

### 4. *Exclusion of mitigation evidence that survivors would receive benefits from defendant's art sales*

As a circumstance in mitigation, the defense offered evidence relating to defendant's artistic efforts during his time in custody. To that end, the defense displayed 10 drawings made by defendant, and a retired prison warden testified that inmates are permitted to sell their artwork in the institution's "hobby shop."

The defense also called as a witness Douglas Gray, an attorney who practiced civil and criminal litigation, and inquired of him as to possible sales of defendant's artwork. Gray related that a woman whose husband had been murdered could sue the murderer and, in the event no answer was filed, ultimately could obtain a default judgment. The defense asked Gray whether monies generated by a prisoner's sales of his or her artwork, held at the institution for the prisoner's benefit, ultimately could be used to satisfy such a judgment. The prosecution objected and requested that Gray's testimony be stricken as speculative and irrelevant. The defense urged that because Mrs. Toovey testified during the guilt phase that she had filed suit against defendant for causing her husband's death and defendant had not filed an answer, the prospect that proceeds from the sale of defendant's artwork might be used to satisfy her default judgment (or other such judgments obtained by the families of other victims) tended to establish that defendant should be sentenced to life in prison without the possibility of parole in order to provide such "restitution" for his crimes.

The trial court ruled that this evidence was not relevant and also noted that if it were admitted, the prosecution would be permitted to offer highly damaging evidence in rebuttal. The court sustained the prosecutor's objection and instructed the jury to disregard Gray's testimony. Defendant contends he was entitled to present any relevant evidence at the penalty phase and that the trial court erred in refusing to admit this testimony.

 It is well established that at the penalty phase of a capital case, the fact finder may not be precluded from considering any relevant mitigating evidence. (*Skipper v. South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 106 S.Ct. 1669]; *Eddings v. Oklahoma* (1982) 455 U.S. 104, 114 [71 L.Ed.2d 1, 102 S.Ct. 869].) The Eighth Amendment to the federal Constitution requires that a capital jury be permitted to consider in mitigation " 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' [Citation.]" (*People v. Williams, supra,* 40 Cal.4th at p. 320.)

As defendant observes, the defense may offer evidence that the defendant, if permitted a life sentence, would behave in prison and earn money toward

the support of his or her family, or would adapt well to prison life and would assist others by employing particular skills, such as writing ability. (See, e.g., *People v. Fudge* (1994) 7 Cal.4th 1075, 1113–1115, 1117 [31 Cal.Rptr.2d 321, 875 P.2d 36].) "Nonetheless, [even in the penalty phase] the trial court . . . ' "determines relevancy in the first instance and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury." ' [Citation.]" (*People v. Williams, supra,* 40 Cal.4th at p. 320.)

In the present case the defense was permitted to introduce evidence of defendant's artistic activities in prison suggesting positive aspects of his character or conduct and, in addition, the possibility that income might be derived from his efforts. The jury previously had learned that defendant had not filed any answer to Mrs. Toovey's lawsuit. Defendant's attempt to present evidence suggesting that the families of defendant's victims ultimately might receive from his artistic efforts a form of financial restitution or compensation for their suffering, however, was likely to lead to the admission of evidence that in total was aggravating rather than mitigating. As the trial court observed, the prosecutor would be permitted to rebut such evidence with evidence highlighting the devastating impact of defendant's acts upon the victims and their families. In addition, the details and prospects of collecting such a judgment would be subject to examination, with the result that the jury would hear evidence that at best was speculative and confusing, and at worst was morally offensive and hardly mitigating in nature. The trial court did not abuse its discretion in excluding the testimony in question.

### 5. *Jury instruction on weighing of factors*

Defendant raises several claims related to the purported inadequacy of CALJIC No. 8.88 (1989 rev.), which instructs the jurors regarding the weighing of circumstances in aggravation and mitigation in deciding the appropriate penalty.

#### a. *Trial court's refusal to instruct on single mitigating circumstance*

Defendant requested that the jury be instructed that a single mitigating circumstance could outweigh multiple aggravating circumstances and by itself justify a verdict of life imprisonment without the possibility of parole. The trial court denied the request. Defendant urges that the language of CALJIC No. 8.88, the standard instruction given to the jury, refers to the jury's consideration of the totality of the aggravating circumstances and the totality of the *mitigating circumstances* and that the instruction advises that in

order to return a verdict of death, each juror must be persuaded that the aggravating circumstances are so substantial in comparison with the *mitigating circumstances* that death is warranted instead of life imprisonment without the possibility of parole. Defendant suggests that, as a result, the jury may have believed that more than one mitigating factor must be demonstrated in order to avoid a verdict of death.

As we have concluded previously, the trial court did not err in declining to give the instruction requested by defendant. (*People v. Cook* (2007) 40 Cal.4th 1334, 1364 [58 Cal.Rptr.3d 340, 157 P.3d 950]; *People v. Breaux* (1991) 1 Cal.4th 281, 316–317 [3 Cal.Rptr.2d 81, 821 P.2d 585]; *People v. Williams* (1988) 45 Cal.3d 1268, 1322 [248 Cal.Rptr. 834, 756 P.2d 221].) In addition, we have held such an instruction "was misleading, because it wrongly implied that at least one mitigating factor was needed to justify a sentence of life imprisonment without parole. (See *People v. Johnson*[, *supra*,] 6 Cal.4th 1, 52 . . . .)" (*People v. Cook, supra*, 40 Cal.4th at p. 1364.)

> b. *The asserted creation of a presumption in favor of a death verdict by the "so substantial" language*

Defendant contends that the "so substantial" language of CALJIC No. 8.88 is unconstitutionally vague under the Eighth Amendment. Defendant acknowledges that we previously have rejected this claim (see, e.g., *People v. Jackson, supra*, 13 Cal.4th at pp. 1242–1243), and raises it here solely to preserve the issue for federal review.

Defendant contends that the "so substantial" language also "does not convey the threshold requirement that aggravation outweigh mitigation" and effectively creates a presumption in favor of a death verdict by suggesting at the outset that the circumstances in aggravation are substantial. We have rejected similar claims in previous cases. (*People v. Carter* (2003) 30 Cal.4th 1166, 1226 [135 Cal.Rptr.2d 553, 70 P.3d 981].)

> 6. *Other claimed instructional errors*

Contrary to defendant's claim, the jury need not be instructed concerning which factors, pursuant to section 190.3, are aggravating and which are mitigating. (*People v. Rogers* (2006) 39 Cal.4th 826, 897 [48 Cal.Rptr.3d 1, 141 P.3d 135] (*Rogers*); *People v. Carter, supra*, 30 Cal.4th at pp. 1229–1230.)

The instructions did not invite the jury to consider inapplicable factors in aggravation. (*Rogers, supra*, 39 Cal.4th at pp. 897–898.)

The instruction concerning the jury's sentencing discretion was not vague or misleading. (*People v. Cook, supra,* 39 Cal.4th 566, 617–618.)

Contrary to defendant's claim, comparative intercase proportionality review is not required by the United States Constitution (*People v. Snow* (2003) 30 Cal.4th 43, 126–127 [132 Cal.Rptr.2d 271, 65 P.3d 749]), although intracase proportionality review is available. (*Rogers, supra,* 39 Cal.4th at pp. 894–895; *People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

CALJIC No. 2.11, explaining that neither party is required to call all witnesses or produce all objects or documents, does not invite the jury to speculate with regard to nonstatutory aggravating factors. (*People v. Mickey* (1991) 54 Cal.3d 612, 702 [286 Cal.Rptr. 801, 818 P.2d 84].)

The statutory language referring to aggravating and mitigating circumstances is not vague or ambiguous. (*Prince, supra,* 40 Cal.4th at p. 1298; *People v. Morrison* (2004) 34 Cal.4th 698, 729 [21 Cal.Rptr.3d 682, 101 P.3d 568].)

The trial court was not required to instruct the jury that "life in prison without possibility of parole means exactly what it says: The defendant will be in prison for the rest of his life." (*People v. Sanders* (1995) 11 Cal.4th 475, 561–562 [46 Cal.Rptr.2d 751, 905 P.2d 420]; see *Rogers, supra,* 39 Cal.4th at p. 899; *People v. Jones* (1997) 15 Cal.4th 119, 189–190 [61 Cal.Rptr.2d 386, 931 P.2d 960].)

### 7. *Cumulative prejudice*

Defendant contends that the asserted errors arising at the penalty phase were cumulatively prejudicial and that those errors, considered together with the asserted errors affecting the guilt phase, were prejudicial at the penalty phase. Defendant, urging that the defense case in mitigation was "compelling," emphasizes that the guilt phase claims related to the prosecutor's "allegations" of molestation, his "maligning" of Dr. Crinella's opinion, and his "treading" upon defendant's right to remain silent "tipped the scales" against defendant. Defendant further suggests that the "explosively prejudicial" impact on the penalty determination of various guilt phase and penalty phase errors must be determined under the standard applicable to review of federal constitutional error as set forth in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], and that to the extent the assertion of error is not based upon the federal Constitution, the claimed error must be reviewed under the test of state law error applicable at the penalty phase, as described in *Brown, supra,* 46 Cal.3d 432, 448. (See, e.g., *Robinson,*

*supra,* 37 Cal.4th at pp. 641–642.) As we previously have explained, however, " '*Brown*'s "reasonable possibility" standard and *Chapman*'s "reasonable doubt" test . . . are the same in substance and effect.' " (*People v. Gonzalez, supra,* 38 Cal.4th at p. 961.) Having reviewed and rejected all of the guilt phase and all except one of the penalty phase assertions of error, we conclude there was no cumulative error.

### 8. *Failure to give curative instructions*

Defendant asserts the trial court was obligated sua sponte to give curative instructions after the prosecutor engaged in the actions and argument that, in defendant's view, constituted misconduct. We have concluded above that the prosecutor did not commit misconduct. No such curative instructions were required. (*People v. Cole* (2004) 33 Cal.4th 1158, 1204, fn. 12 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

### 9. *Multiple-murder special circumstance: narrowing function*

 Defendant asserts the multiple-murder special circumstance fails to narrow the class of persons eligible for the death penalty, as required by the federal Constitution. "[C]ategorizing as especially deserving of the ultimate penalty those offenders who kill two or more victims in one criminal event is not arbitrary, unfair or irrational, and performs the necessary narrowing of the pool of potential offenders required by the Eighth Amendment to the United States Constitution." (*People v. Boyette* (2002) 29 Cal.4th 381, 440 [127 Cal.Rptr.2d 544, 58 P.3d 391]; see *People v. Yeoman, supra,* 31 Cal.4th 93, 165.)

### 10. *Asserted unconstitutional vagueness of section 190.3, factor (a)*

Defendant also asserts that section 190.3, factor (a), which permits the jury to consider the circumstances of the crime as a possible aggravating factor, is so broad and ill defined that it encourages jurors to impose the death penalty arbitrarily and capriciously. Defendant provides examples from California decisions demonstrating that prosecutors have relied upon a wide range of facts in arguing that the circumstances of the crime should be treated as an aggravating factor. As we previously have noted, judicial decisions have rejected these vagueness and overbreadth arguments. (See *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Cook, supra,* 40 Cal.4th at p. 1366; *Panah, supra,* 35 Cal.4th at p. 499; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1064 [90 Cal.Rptr.2d 607, 988 P.2d 531].) As the high court stated in *Tuilaepa,* "[t]he circumstances of the crime are a traditional subject for consideration by the

sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence." (*Tuilaepa, supra,* 512 U.S. at p. 976; see *People v. Cook, supra,* 40 Cal.4th at p. 1366.)

### 11. *Delay in execution*

Defendant claims that the "extraordinary delay" that is transpiring between his sentencing and the execution of his punishment constitutes cruel and unusual punishment. (*Lackey v. Texas* (1995) 514 U.S. 1045 [131 L.Ed.2d 304, 115 S.Ct. 1421] (mem. opn. of Stevens, J., on denial of cert.).) We repeatedly have concluded that delay, whether in the appointment of counsel on appeal or in processing the appeal, or both, does not inflict cruel or unusual punishment within the meaning of the state or federal Constitution. (*Prince, supra,* 40 Cal.4th at p. 1298; *People v. Demetrulias* (2006) 39 Cal.4th 1, 45 [45 Cal.Rptr.3d 407, 137 P.3d 229] (*Demetrulias*); *People v. Lewis* (2004) 33 Cal.4th 214, 232–233 [14 Cal.Rptr.3d 566, 91 P.3d 928]; *People v. Lenart* (2004) 32 Cal.4th 1107, 1131 [12 Cal.Rptr.3d 592, 88 P.3d 498].)

### 12. *Challenges to California's death penalty scheme*

Defendant raises numerous constitutional challenges to the California death penalty statute that we repeatedly have rejected in prior decisions. Defendant has not persuaded us to reexamine these holdings.

### a. *"Narrowing function; overbreadth of statutory array"*

California's death penalty statute does not fail to narrow the class of offenders who are eligible for the death penalty, as is required by the Eighth Amendment, nor has the statute been expanded "beyond consistency with" the Fifth and Fourteenth Amendments. (*Prince, supra,* 40 Cal.4th at pp. 1297–1298; *Lewis and Oliver, supra,* 39 Cal.4th at p. 1068; *People v. Gray, supra,* 37 Cal.4th at p. 237; *Robinson, supra,* 37 Cal.4th at p. 655; *People v. Smithey* (1999) 20 Cal.4th 936, 1017 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

### b. *Absence of written findings*

"The California death penalty statute is not unconstitutional in failing to require the jury to make written findings concerning the aggravating circumstances it relied upon, nor does the failure to require written findings preclude meaningful appellate review." (*Prince, supra,* 40 Cal.4th at p. 1297; see *Alfaro, supra,* 41 Cal.4th at pp. 1331–1332; *Robinson, supra,* 37 Cal.4th at p. 655; *People v. Morrison, supra,* 34 Cal.4th at pp. 730–731.)

c. *Absence of instructions on burden of proof*

 The absence of instructions to the jury concerning the correct burden of proof did not infringe upon defendant's constitutional rights. (*Alfaro, supra*, 41 Cal.4th at p. 1331; *Prince, supra*, 40 Cal.4th at p. 1297.) "Failure to require that the jury unanimously find the aggravating circumstances true beyond a reasonable doubt, to find unanimously and beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances, or to require a unanimous finding beyond a reasonable doubt that death is the appropriate penalty does not violate the Fifth, Eighth, or Fourteenth Amendment guarantees of due process and a reliable penalty determination." (*Prince, supra*, 40 Cal.4th at p. 1297; see *People v. Cook, supra*, 40 Cal.4th 1334, 1365; *Box, supra*, 23 Cal.4th at p. 1217.) Neither *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], nor *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], nor *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], "affects California's death penalty law or otherwise justifies reconsideration of the foregoing decisions." (*People v. Morrison, supra*, 34 Cal.4th at p. 731.) The high court's recent decision in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856] merely extends the *Apprendi* and *Blakely* analyses to California's determinate sentencing law and has no apparent application to California's capital sentencing scheme. (*Prince, supra*, 40 Cal.4th at p. 1297.) In *Apprendi, supra*, 530 U.S. 466, the high court "found a constitutional requirement that any fact, other than a prior conviction, which increases the maximum penalty for a crime must be formally charged, submitted to the fact finder, treated as a criminal element, and proved beyond a reasonable doubt. [Citation.] But under the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death is no more than the prescribed statutory maximum for the offense; the only alternative *is* life imprisonment without possibility of parole." (*People v. Anderson* (2001) 25 Cal.4th 543, 589–590, fn. 14 [106 Cal.Rptr.2d 575, 22 P.3d 347], italics added & omitted; see *Prince, supra*, 40 Cal.4th at pp. 1297–1298.)

d. *Absence of requirement that the jury agree as to aggravating factors*

We previously have concluded the federal Constitution does not require that the jury agree or be instructed it must agree which aggravating factors are applicable. (*People v. Cook, supra*, 40 Cal.4th at p. 1365; *People v. Cook, supra*, 39 Cal.4th at p. 603; *Robinson, supra*, 37 Cal.4th at p. 654; *People v. Young* (2005) 34 Cal.4th 1149, 1233 [24 Cal.Rptr.3d 112, 105 P.3d 487].)

### e. *Effect of use of "extreme" in section 190.3, factor (d), concerning mental disturbance*

As we have stated generally, "[t]he use of the terms 'extreme' or 'substantial' does not improperly limit the jury's consideration of mitigating evidence in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments." (*Prince, supra,* 40 Cal.4th at p. 1298; see *People v. Smith* (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302].) We have rejected the claim that the word "extreme" should be omitted from the language of section 190.3, factor (d). (*People v. Yeoman, supra,* 31 Cal.4th at p. 145.)

### f. *Prosecutorial discretion*

We also have rejected claims that the death penalty statute unconstitutionally grants unfettered discretion to prosecutors to decide whether to charge eligible defendants with a capital offense or seek the death penalty, resulting in disparate imposition of the death penalty throughout the state. (*Alfaro, supra,* 41 Cal.4th at p. 1330; *Prince, supra,* 40 Cal.4th at p. 1298; *People v. Vieira* (2005) 35 Cal.4th 264, 304 [25 Cal.Rptr.3d 337, 106 P.3d 990]; *Box, supra,* 23 Cal.4th at p. 1217.)

### g. *Frequency of imposition of death penalty in light of international norms*

Our sentencing scheme does not violate international norms of humanity and decency. " ' " 'International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.' " ' " (*Alfaro, supra,* 41 Cal.4th at p. 1332.)

"Defendant points out that all Western European countries, and many others around the world, have either abolished the death penalty or restrict its use to extraordinary crimes. He contends that this near-consensus demonstrates evolving standards of decency and humanity that should be deemed to bar use of execution 'as a regular form of punishment' under the Eighth Amendment to the United States Constitution. As we recently said, however, '[d]efendant's argument that the use of capital punishment "as *regular punishment* for substantial numbers of crimes" violates international norms of human decency and hence the Eighth Amendment to the United States Constitution fails, at the outset, because California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to "regular punishment" for felonies. (E.g., Cal. Const., art. VI, § 11; §§ 190.1–190.9, 1239,

subd. (b).)' " (*People v. Brasure* (2008) 42 Cal.4th 1037, 1071–1072 [71 Cal.Rptr.3d 675, 175 P.3d 632], quoting *Demetrulias, supra*, 39 Cal.4th at pp. 43–44; see *Moon, supra*, 37 Cal.4th at p. 48; accord, *People v. Bell, supra*, 40 Cal.4th at p. 621.)

h. *Imposition of death penalty balanced with postconviction relief*

Defendant incorporates by reference Justice Blackmun's dissenting opinion in *Callins v. Collins* (1994) 510 U.S. 1141, 1143 [127 L.Ed.2d 435, 114 S.Ct. 1127], concerning procedural barriers to habeas corpus relief, adding that the limitations to federal postconviction proceedings described in that opinion apply to California postconviction proceedings as well. We previously have rejected this claim. (*Demetrulias, supra*, 39 Cal.4th at pp. 44–45; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1255 [69 Cal.Rptr.2d 784, 947 P.2d 1321].)

i. *Adequacy of federal and state court postconviction relief*

Defendant relies upon Justice Blackmun's concurring opinion in *Sawyer v. Whitley* (1992) 505 U.S. 333, 357–360 [120 L.Ed.2d 269, 112 S.Ct. 2514], which discusses the increasing procedural barriers to the consideration of the claims of condemned prisoners in federal habeas corpus proceedings, and asserts that the mounting federal habeas corpus procedural barriers, considered with increasing comparable barriers in the state courts, have rendered the system of review of capital convictions and sentences more arbitrary and less reliable than it was at the time capital punishment was resumed in the 1970's. Defendant has not established or provided authority for the proposition that such a result has occurred.

j. *Cruel and unusual punishment: asserted arbitrary administration of the death penalty*

Defendant adopts by reference Judge Noonan's dissenting opinion in *Jeffers v. Lewis* (9th Cir. 1994) 38 F.3d 411, 425–427, urging that the administration of the death penalty in California is so arbitrary as to constitute cruel and unusual punishment. We previously have rejected this argument. (*Demetrulias, supra*, 39 Cal.4th at pp. 44–45.)

13. *Cruel and unusual punishment: lethal injection*

Defendant contends that California's method of execution by lethal injection constitutes cruel and unusual punishment, in violation of the Eighth Amendment to the federal Constitution. We repeatedly have rejected this claim. (*Lewis and Oliver, supra*, 39 Cal.4th at p. 1068; *People v. Young, supra*,

34 Cal.4th at p. 1234.) Moreover, asserted "imperfections in the method of execution do not affect the validity of the death judgment itself." (*People v. Boyer* (2006) 38 Cal.4th 412, 485 [42 Cal.Rptr.3d 677, 133 P.3d 581]; see *Baze v. Rees* (2008) 553 U.S. ___, ___–___ [170 L.Ed.2d 420, 128 S.Ct. 1520, 1537–1538] [rejecting challenge to lethal-injection procedure of the State of Kentucky based upon the 8th Amend.]; *Morales v. Hickman* (9th Cir. 2006) 438 F.3d 926, 931 [affirming federal district court's modification of California's protocol for lethal injection in lieu of injunctive relief].)

### 14. *Asserted ineffective assistance of counsel*

■ Defendant contends he received constitutionally defective assistance from his trial counsel at both the guilt and penalty phases of his trial. " 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]' " (*Lopez, supra,* 42 Cal.4th at p. 966, quoting *People v. Ledesma, supra,* 39 Cal.4th at pp. 745–746.)

#### a. *Failure to challenge jurisdiction based upon Treaty violation*

As discussed above, we have entertained defendant's jurisdictional challenge despite any failure by his counsel to raise this claim at trial. Accordingly, defendant cannot establish prejudice from the asserted deficient performance of trial counsel in this respect.

#### b. *Failure to emphasize certain evidence in motion to suppress*

Defendant asserts that in moving to suppress evidence of his confession, defense counsel failed specifically to make the points raised in part II.A.3.,

*ante* (guilt phase contentions)—that in advising defendant of his *Miranda* rights, Detective Edmonds did not adequately advise him of his right to speak to an attorney and have an attorney present during questioning, and failed to advise defendant that he faced the death penalty. As we explained earlier, the detective carefully and adequately advised defendant of his constitutional rights. Accordingly, defendant's claim fails.

### c. *Failure to make a timely* Pitchess *motion*

Because we have concluded that defendant's discovery motion under *Pitchess v. Superior Court, supra,* 11 Cal.3d 531, 536–537, properly was denied on its merits, defendant cannot establish prejudice from any ineffective assistance of trial counsel in failing to make the motion earlier.

### d. *Failure to object to excusal for cause of Prospective Juror F.P.*

Because we have determined that Prospective Juror F.P. properly was excused for cause, defendant cannot establish prejudice from any possible ineffective assistance of trial counsel in failing to object when the trial court granted the prosecutor's challenge for cause.

### e. *Failure to object to Detective Edmonds's guilt phase opinion testimony*

Defendant contends trial counsel failed to object to the portion of defendant's tape-recorded confession in which Detective Edmonds conveyed his opinion that defendant had attempted to sexually molest the Richards girls and had failed to tell the truth about his actions. As we concluded above, Edmonds's comments in the course of his interview with defendant do not constitute improper opinion testimony. Moreover, trial counsel attempted to exclude all evidence relating to that line of questioning. Trial counsel did not render ineffective assistance.

### f. *Failure to object to prosecutorial misconduct*

Because the prosecutor's arguments discussed above were appropriate, there was no reason for an objection, and defense counsel's failure to make an objection was not unreasonable. Accordingly, the failure to object did not result in a violation of defendant's constitutional right to the effective assistance of counsel. (*Lopez, supra,* 42 Cal.4th at p. 968; *People v. Dickey* (2005) 35 Cal.4th 884, 915 [28 Cal.Rptr.3d 647, 111 P.3d 921]; *Rodrigues, supra,* 8 Cal.4th at p. 1126; see *Holt, supra,* 15 Cal.4th at p. 691 ["Inasmuch

as the comment [on defendant's lack of remorse] was not improper, counsel had no basis for an objection and the failure to object cannot be deemed incompetence."].)

■ As we have observed, "except in those rare instances where there is no conceivable tactical purpose for counsel's actions," claims of ineffective assistance of counsel generally must be raised in a petition for writ of habeas corpus based on matters outside the record on appeal. (*Lopez, supra,* 42 Cal.4th at p. 972; see *People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266–267.) The rule is particularly apt when the asserted deficiency arises from defense counsel's failure to object. "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse, supra,* 27 Cal.4th at p. 502; see also *People v. Dickey, supra,* 35 Cal.4th at p. 914; *People v. Boyette, supra,* 29 Cal.4th at p. 433.) Here, the record establishes that defense counsel had valid tactical reasons for not objecting to, and not asking the trial court to tell the jury to disregard, the prosecutor's arguments.

### g. *Failure to move for new trial*

Defendant contends trial counsel rendered ineffective assistance by failing to move for a new trial on the grounds of prosecutorial misconduct, insufficiency of the evidence of defendant's deliberation in the murders of the Richards girls, and the prejudicial impact of the evidence suggesting sexual misconduct was committed upon these victims. Because we have concluded there was no error as to the underlying claims, it follows that trial counsel did not render ineffective assistance in failing to seek a new trial on those grounds.

### 15. *Motion for continuance to enable the defense to review juror questionnaires*

Defendant contends the trial court erred in denying his motion for a continuance, following return of the penalty phase verdict on November 16, 1990, that was sought to enable the defense to receive and review questionnaires that it sent to individual jurors in an attempt to ascertain (prior to the sentencing hearing set for Dec. 17, 1990) whether any juror misconduct had occurred. The record reflects that a single juror response was received to the defense questionnaire, which was sent to the jurors on December 7. The trial court did not abuse its discretion in determining that the defense had not shown good cause why a continuance was necessary.

Defendant has not demonstrated that any material error occurred at the penalty phase, or that he suffered prejudice at that stage of the proceedings.

## III. CONCLUSION

The judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 27, 2008, and the opinion was modified to read as printed above.